Andrew CHOY, Appellant,

v.

**GRAZIANO ROOFING OF TEXAS, INC., Appellee.**

**No. 01–07–00761–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 1, 2009.

Rehearing Overruled Dec. 9, 2009.

Lawrence D. Pennoni, Spring, TX, Matthew Zane Harthorne, Steven J. Knight, Wayne A. Risoli, Chamberlain, Hrdlicka, White, Williams & Martin, Houston, TX, for Appellant.

M.H. Cersonsky, Nathan J. Milliron, Alonso, Cersonsky & Garcia, P.C., Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

EVELYN V. KEYES, Justice.

In this dispute over construction trust funds, appellant, Andrew Choy, appeals the trial court's judgment in favor of appellee, Graziano Roofing, Inc. (Graziano). In three issues, Choy argues that the trial court erred in (1) rendering judgment, because Graziano failed to prove each element to establish a violation of the Texas Trust Fund Act (the Act)[1]; (2) concluding

1. *See* TEX. PROP.CODE ANN. § 162.001–162.033 (Vernon 2007).

that liability exists under the Act for intracompany transfers of funds; and (3) awarding pre-judgment interest.

We affirm.

## Background

In 1998, Lake Olympia Development Corporation (Lake Olympia) created Windwater Homes, L.L.C. (Windwater), a wholly owned subsidiary,[2] to build homes in Harris and Fort Bend County. The companies were owned by Tan Yu, and Choy served as the president of the companies. Windwater hired Graziano, a roofing contractor, to install roofs on the homes it was building. Pursuant to their agreement, Graziano performed roofing work and supplied roofing materials on a total of 39 properties for Windwater and invoiced Windwater $226,336.10 for the work and roofing materials supplied. To pay for this work, Windwater obtained construction loans from Citibank of Texas ("Citibank") and Frost National Bank ("Frost Bank").

On December 3, 2002, Graziano sued Lake Olympia and Windwater. In its third amended petition, Graziano added claims against Choy, individually. Graziano alleged that, instead of paying Graziano with the construction loan proceeds, Choy had made the decision to misapply or had actually misapplied the funds received for that purpose by Windwater, which he controlled. This appeal follows from the bench trial on Graziano's "Third Amended Petition," filed July 23, 2004. For purposes of trial, Graziano relied on Windwater records it was able to reconstruct following Windwater's bankruptcy. It sought recovery for only 21 of the properties. The damages sought reflected the total principal amount of $134,396.09 for these 21 properties—the original total invoice amount of $226,336.10 for all 39 properties reduced to reflect a payment made by the Windwater bankruptcy trustee to Graziano and by the debt on properties not included in the suit. Graziano also sought its attorney's fees[3] and pre-judgment[4] and post-judgment interest.

Following Windwater's bankruptcy, the case was tried to the bench. At trial, Citibank's loan service manager for Windwater, Vernon Facundo, testified that the draw construction sheet included in the business records was the sheet used by the inspector for each draw request. Facundo testified that when a draw request was received by Citibank, the inspector used that sheet to go out to the particular property and document that whatever item was being billed at that time was complete. Facundo also testified that roofing work was typically completed at 35.5 percent of total completion of the house and that the draw was then funded. These procedures were followed with regard to Windwater. In addition, Citibank's loan information sheets were used to annotate all the applicable loan information from origination through payoff, together with all advances. Citibank relied upon the construction draw requests to disburse funds to Windwater. Each referenced a percentage of completion. Citibank's wire transfer form was then used to wire out the construction funds to Windwater's checking account at another bank.

Choy testified that he started working for Lake Olympia in 1983 as president and

---

2. Windwater and Lake Olympia filed for bankruptcy on April 4, 2003 and are not parties to this appeal. Graziano filed a claim of proof in that proceeding and it received $54,000 from the bankruptcy.

3. *See* Tex. Civ Prac & Rem.Code Ann. § 38.001 (Vernon 2008).

4. *See* Tex. Prop.Code Ann § 28.001 (Vernon 2000).

that his duties chiefly consisted of management for land development and sales and marketing. In 1997, the company was sold to America First Corp., Inc., owned by Tan Yu. Choy retained the title of president. In 1998, Windwater was created as a wholly-owned subsidiary for the purpose of home building. Choy was President of Windwater as well. In 1999, Choy discovered that Tan Yu had started removing money from the Windwater, amounting in the end to $4.732 million. The money was therefore not used for Lake Olympia or Windwater purposes.

Windwater paid its contractors after they submitted an invoice to Windwater's superintendent, who initialed and approved payment. The bookkeeper then issued a check, which Choy would look at when it came to him for signing. Windwater made draw requests on banks in order to pay its contractors. Choy testified that Tan Yu "possibly" took some of the funds received from these draw requests overseas. He did not authorize the construction loan proceeds going overseas, but he knew the loan construction proceeds owed to Graziano were taken overseas because "[t]his particular bank, there's no separate account. It's just the account for the company."

Choy admitted that if somebody signed a draw request for completed roofing work it would be safe to say that someone at Windwater thought the roof was complete on the property. He also admitted that Windwater did not use construction loan proceeds to pay Graziano Roofing for some properties. He agreed it was "possible" that some of the construction loan home proceeds were sent to Tan Yu. Choy issued check and wire transfers from Windwater's operating accounts to Tan Yu when Yu directed him to do so. Choy stated that he did not have a choice as to whether to send money to Tan Yu rather than to contractors because Tan Yu was the owner of the company, and, if he had refused to comply, he would have been fired. Choy admitted he knew that Graziano and other contractors did not get paid for work they had completed. Choy also admitted that bank interest and some payrolls were not paid. Tan Yu also knew the contractors were not being paid for their work. Approximately $4.723 million was wired from Windwater to Tan Yu.

Adam Stanford, Vice–President of Graziano, testified that Exhibit 55 was a summary of invoices for amounts due Graziano for its work for Windwater. The checks Graziano received for payment were signed by Choy or Brigit Halloran. Stanford further testified that Graziano was seeking $134,396.90 in damages, reduced by about $2,600 due to the discovery of a mathematical error.

On June 7, 2007, the trial court entered a final judgment that Graziano recover from Choy the sum of $131,796.09 plus pre-judgment interest and attorney's fees of $65,000, together with costs of unsuccessful appeal, costs of court, and post-judgment interest. On July 12, 2007, the trial court issued findings of facts and conclusions of law.

## Standard of Review

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them just as we would review a jury's findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *In re K.R.P.*, 80 S.W.3d 669, 673 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). When challenged, a trial court's findings of fact are not conclusive if, as in the present case, there is a complete reporter's record. *In re K.R.P.*, 80 S.W.3d at 673; *Amador v.*

*Berrospe,* 961 S.W.2d 205, 207 (Tex.App.-Houston [1st Dist.] 1996, writ denied). When a party without the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force to support the finding, i.e., more than a mere scintilla, we will overrule the issue. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). An omitted finding, supported by the evidence, may be supplied by a presumption that it supports the judgment. *Black v. Dallas County Child Welfare Unit,* 835 S.W.2d 626, 630 n. 10 (Tex.1992). In our review of the factual sufficiency of the evidence, we must consider and weigh all of the evidence, and we will set aside a verdict only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). We review a trial court's conclusions of law de novo. *In re Moers,* 104 S.W.3d 609, 611 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd). We independently evaluate a trial court's conclusions to determine their correctness, and we will uphold conclusions on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.*

## I. Failure to Prove Each Element of Violation of the Trust Fund Act

In his first issue, Choy argues that the trial court erred in rendering judgment because Graziano failed to prove each element necessary to establish a violation of the Act. Specifically, Choy contends that Graziano was required to prove (1) the existence of trust funds, as defined by the Act, related to CitiBank and Frost Bank; (2)(a) Choy's duty to Graziano as a trustee under the Act to pay out funds to Graziano as a beneficiary under the Act, and (b) the tracing of funds from any loan proceeds to the timing of the receipt and disbursement of the funds; and (3) the misapplication of trust funds by Choy, rendering him personally liable under the Act. Choy argues that the trial court's findings with respect to those elements were not supported by legally and factually sufficient evidence.

The Texas Supreme Court has indicated that the Act should be construed liberally in favor of laborers and materialmen. *RepublicBank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985). The Act was specifically enacted to serve as a special protection for subcontractors and materialmen, when contractors refuse to pay the subcontractor or materialman for labor and materials. *Taylor Pipeline Constr., Inc. v. Directional Road Boring, Inc.,* 438 F.Supp.2d 696, 715 (E.D.Tex.2006); *Herbert v. Greater Gulf Coast Enters., Inc.,* 915 S.W.2d 866, 870–71 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

### A. Existence of Trust Funds as Defined by the Act Related to Citibank and Frost Bank

Choy first argues that legally insufficient evidence supports the existence of "trust funds" within the meaning of the Act. Specifically, he argues that "there is no evidence, or insufficient evidence to support Findings of Fact Nos. 13–23, 27–34 and 40." Choy contends that Graziano was required to prove "as to each Windwater loan, that loan receipts were received by Windwater or Mr. Choy, (2) that the loan receipts were from a loan for the improvement of specific real property, and (3) that the loan was secured by a lien on that same property." He contends the

evidence is legally and factually insufficient to satisfy these requirements.

The findings of fact challenged in this section state:

13. Windwater obtained construction loans to finance the construction of the homes made the basis of this lawsuit.

14. The loans were for the improvement of specific real property in Texas.

15. Construction loans were obtained from First American Bank, SSB, now known as Citibank of Texas ("Citibank") for twelve (12) properties, as set forth in Exhibits 180–193, which are incorporated herein for all purposes.

16. The construction loans obtained by Windwater from Citibank and Frost Bank were secured in whole or in part by a lien on real property upon which Graziano Roofing supplied materials and performed labor.

17. Citibank distributed construction loan proceeds to Windwater Homes for roofing work because according to Citibank's draw schedule (Exhibit 100) roofing work was completed by the 35.5% mark. See Exhibit 100 (Construction Lending Department Inspection Sheet).

18. Windwater received the loan proceeds from Citibank. See Exhibits 140–176. Exhibits 110–120 (Prop. Info. Sheets showing percentage of completion and amounts disbursed), Exhibits 140–176 (Draw Requests and Wire Transfers), Exhibits 180–193 (Summary of Citibank Records). These documents show that construction work on the properties were at the 35.5% mark or higher. The construction loan proceeds for these properties were trust funds.

19. According to Citibank's draw schedule roofing work was done between the 30.0% and 35.5% marks. The property at 7110 Harmony Cove was only 33.5% complete according to the draw schedule, thus, the amount of trust funds would be only $3,232.00.

20. Loan proceeds of $57,719.35 for construction work, were disbursed for 7110 Harmony Cove as shown on Exhibits 120B and 182 which are incorporated herein as if set out verbatim. None of the loan proceeds for 7110 Harmony Cove were distributed to Graziano Roofing.

21. Citibank's records show construction loan proceeds for roofing work and materials and other construction work were disbursed or distributed to Windwater for the properties listed on Exhibits 180–193 total $1,840,782.85 (excluding the money disbursed for 7110 harmony cove). See Exhibit 193. These exhibits are incorporated herein as if set out verbatim.

22. None of the construction loan proceeds of $1,840,782.85 disbursed by Citibank to Windwater were applied to pay for the roofing work done by Graziano Roofing.

23. Based on the loan proceeds received from Citibank by Windwater, the amount of the loan proceeds or trust funds owed to Graziano Roofing is $81,584.20[. T]his figure includes a 7.905% reduction from the figure of $88,587.00 because 7.905% of the original principal debt was paid by the Bankruptcy Trustee.

. . . .

27. Construction loan proceeds for roofing work done by Graziano Roofing were received by Windwater and were not disbursed or paid to Graziano.

28. Construction loans were obtained from Frost Bank to build upon or improve nine (9) properties, as set forth in Exhibits 210–215 and 220, which are incorporated herein for all purposes.

29. The construction loans obtained by Windwater from Frost Bank were secured in whole or in part by a on real property upon which Graziano Roofing supplied materials and performed labor in constructing an improvement on the property, namely a roof.

30. Frost Bank distributed construction loan proceeds to Windwater Homes for roofing work on nine (9) properties as set forth in Exhibits 210–215 and 220. These Exhibits are incorporated herein as if set out verbatim.

31. Frost's documents, including the draw requests submitted by Choy and others, shows the roofing work was completed.

32. Windwater received the loan proceeds from Frost Bank to pay for roofing work done by Graziano Roofing. See Exhibit 220, which is incorporated herein for all purposes.

33. Thus, with regard to Frost Bank, construction draws or loan proceeds for roofing work and materials for the properties listed on Exhibit 220 total $87,517.72.

34. The construction loan proceeds of $87,517.72 disbursed by Frost Bank to Windwater for roofing work were not paid to Graziano Roofing, Inc. See Exhibit 220, which is incorporated herein for all purposes.

. . . .

40. Windwater failed to pay Graziano Roofing for the roofing work that Graziano Roofing performed even though Windwater received construction loan proceeds from Frost Bank to pay for the roofing work.

### 1. "Trust Funds" Under the Act

Section 162.001 of the Act, entitled "Construction Payments and Loan Receipts as Trust Funds," provides,

(a) Construction payments are trust funds under this chapter if the payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property in this state.

(b) Loan receipts are trust funds under this chapter if the funds are borrowed by a contractor, subcontractor, or owner or by an officer, director, or agent of a contractor, subcontractor, or owner for the purpose of improving specific real property in this state, and the loan is secured in whole or in part by a lien on the property.

TEX. PROP.CODE ANN. § 162.001(a), (b) (Vernon 2007).

The loan documents introduced into the record show that Windwater received home construction loan funds borrowed from Citibank and Frost Bank for the purpose of improving the specific real property in Texas for which Graziano seeks damages. The loan documents further show that each loan was secured by a

deed of trust, which is a type of lien.[5] Exhibits 210 through 215 document draw requests made by Windwater on Frost Bank specifying the amount requested and the date of the request for nine different properties. Exhibit 220 contains a summary of the disbursed funds from Frost Bank for the various properties, showing the draw amount for the roofing work, the funding of the draw, and the amount of Graziano's invoices. Exhibits 180 through 191 document Windwater's draw requests to Citibank[6] and Citibank's wire transfers to Windwater's account of funds for 12 different properties. Exhibit 192 contains a summary of the properties, the amount drawn, and the amount invoiced.

Specifically, according to Citibank's "Construction Lending Department Inspection Sheet," Citibank considered roofing work complete for the purpose of disbursing construction loan proceeds to Windwater at the 35.5% completion point. In addition, Citibank's representative, Vernon Facundo, testified that Exhibit 100

> is the sheet that is used by the inspector for each draw request. When a draw request is received the inspector uses this sheet to go out to the particular property and document that, whatever item is being billed at that time according to the inspection sheet that it has been complete.

The record of Citibank's construction lending to Windwater shows, through the draw requests, wire transfer forms, and confirmations entered in the record by Graziano, that Graziano did roofing work on the 11 homes whose roofing was more than 35% complete and for which Graziano seeks recovery in this suit; that Graziano invoiced Windwater in a specific amount

for its completed work on each of those homes; that Windwater promptly sent a draw request to Citibank in response to each invoice; and that, upon receipt of the draw requests, Citibank immediately funded each request by wire to Windwater for the invoiced roofing work. The 11 Citibank properties on which more than 35% of the roofing was completed by Graziano and for which draws were made, were 7138 Turtle Lagoon Row (89% complete); 7126 Turtle Lagoon Row (84% complete); 7106 Harmony Cove (74% complete); 7139 Windwater Lagoon (41.5% complete); 150 Palm Boulevard (78% complete); 6023 Arrowana Lane (89% complete); 6027 North Arrowana Lane (75.5% complete); 7118 Harmony Cove (47.5% complete); 7114 Harmony Cove (46.5% complete); 7110 Laguna Villas Lane (36.5% complete); and 226 Flamingo Island Drive (90.5% complete). The property at 7110 Harmony Cove was listed as being only 33.5% complete, rather than a minimum of 35% complete. Therefore, Graziano allowed for a $2600 reduction of the amount that would be due for complete roofing for 7110 Harmony Cove. The amount due Graziano for labor and materials on the property at 7110 Harmony Cove was likewise properly invoiced, and funds to pay Graziano's invoice were requested and received by Windwater.

Frost Bank records show that Windwater submitted six Construction Draw Requests to Frost Bank. These Construction Draw Requests encompassed the nine Frost Bank properties on which Graziano had done the roofing. Each of the Construction Draw Requests was signed by Choy or Halloran as an officer and agent of Windwater, and each stated "Roof Com-

---

5. Thus, Choy's assertion that the word "lien" is not present in the trial record and Graziano failed to prove the existence of a lien on each property is without merit.

6. The draw requests are in the name of First American Bank, which is now Citibank.

plete." Choy also testified that if somebody at Windwater signed a draw request it would be safe to say that someone at Windwater thought the roof was complete on the property. Frost Bank records show the roofing work complete at 5935 Turtle Beach Lane, 5927 Turtle Beach Lane, 7110 Turtle Lagoon Row, 7114 Turtle Lagoon Row, 7122 Turtle Lagoon Row, 5931 Turtle Beach Lane, 5923 Turtle Beach Lane, 7118 Turtle Lagoon Row, and 7106 Turtle Lagoon Row. The "Summary of Completion and Funds Disbursed from Frost Bank" shows that draw requests were made by Windwater at the time the roofing was completed and that each was immediately funded by Frost Bank. These exhibits were admitted without objection. Choy submitted no contrary evidence.

Viewing the evidence in the light most favorable to Graziano and indulging every reasonable inference in its favor, we conclude that the evidence is legally sufficient to support the challenged findings. *See Associated Indem. Corp.*, 964 S.W.2d at 285–86. Considering and weighing all of the evidence, we further conclude that the challenged findings are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, and therefore the evidence is factually sufficient. *Ortiz*, 917 S.W.2d at 772. Accordingly, after reviewing the exhibits, we conclude that the trial court correctly classified the funds obtained from Frost Bank and Citibank as construction trust funds requested by Windwater to pay its obligations to Graziano for completed roofing work on the properties at issue in this suit and wire transferred to Windwater's account by Citibank and Frost Bank for that purpose. *See* Tex. Prop.Code Ann. § 162.001(b).

Choy argues, however, that, in addition, Graziano failed to introduce "any documentary evidence of the dates when Graziano supplied labor and/or materials to each property ..., the dates any invoices were issued to Windwater, or the dates any obligations owed to Graziano by Windwater were due and payable under the terms of any invoice issued to Windwater under the terms of any contract with Windwater." Choy provides no argument or authority for the inclusion of the requirements he seeks to add to the proof of the existence of trust funds under § 162.001(b) of the Act. It is cardinal law in Texas that a court construes a statute, "first, by looking to the plain and common meaning of the statute's words" and, if the language is unambiguous, adopting the interpretation supported by the plain meaning of the provision's words and terms. *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex.1999); *see* Tex. Gov't Code Ann. §§ 311.011; 312.002 (Vernon 2005). Courts "may add words into a statutory provision only when necessary to give effect to clear legislative intent," and "[o]nly truly extraordinary circumstances showing unmistakable legislative intent should divert us from the enforcing the statute as written." *Fitzgerald*, 996 S.W.2d at 867. We find no support in the statute, the case law, or the rules of statutory construction for the requirements Choy seeks to add to the proof of "trust funds" under section 162.001(b) of the Act, and we decline to add them.

## B. Duty of Choy as Trustee to Pay Out Funds to Graziano as Beneficiary Under the Act and Evidence Tracing Funds Received and Disbursed

### 1. Duty of Choy as Trustee to Pay Out Funds to Graziano as Beneficiary Under the Act

Choy also argues that the evidence is legally and factually insufficient to show

that he was a trustee and that Graziano was a beneficiary of trust funds. Specifically, he argues that Graziano "failed to establish that Windwater and Mr. Choy had a duty to pay out any trust funds to Graziano; nor did Graziano offer evidence tracing funds from any loan proceeds or bank accounts to establish the timing of the receipt and alleged disbursement of funds." He argues that there was no evidence or insufficient evidence to support findings of fact 3, 7–8, 18–19, 21, 23, 31–33, 35, 40–41. Thus, he argues that conclusions of law 8–11, 13–14, and 16 were erroneous because they were based upon findings of fact for which there was no evidence or insufficient evidence.

The challenged findings state:

3. Windwater contracted with Graziano Roofing of Texas, Inc. ("Graziano Roofing") to furnish and install Monier Lifetile roofs on homes built by Windwater.

. . . .

7. The properties for which roofing materials and roofing service were provided and not paid as of the last invoice date on November 11, 2002 are listed on Exhibits 57 and 57A.[7] Those Exhibits are incorporated into these findings as if set out verbatim.

8. The total principle amount owed to Graziano Roofing as of November 11, 2002 was $226,336.10.

. . . .

18. Windwater received the loan proceeds from Citibank. See Exhibits 140–176. Exhibits 110–120 (Prop. Info. Sheets showing percentage of completion and amounts disbursed), Exhibits 140–176 (Draw Requests and Wire Transfers), Ex-

hibits 180–193 (Summary of Citibank Records). These documents show that construction work on the properties were at the 35.5% mark or higher. The construction loan proceeds for these properties were trust funds.

19. According to Citibank's draw schedule roofing work was done between the 30.0% and 35.5% marks. The property at 7110 Harmony Cove was only 33.5% complete according to the draw schedule, thus, the amount of trust funds would only be $3,232.00.

. . . .

21. Citibank's records show construction loan proceeds for roofing work and materials and other construction work were disbursed or distributed to Windwater for the properties listed on Exhibits 180–193 total $1,840,782.85 (excluding the money disbursed for 7110 Harmony Cove). See Exhibit 193. These exhibits are incorporated herein as if set out verbatim.

. . . .

23. Based on the loan proceeds received from Citibank by Windwater, the amount of the loan proceeds or trust funds owed to Graziano Roofing is $81,584.20[. T]his figure includes a 7.905% reduction from the figure of $88,587.00 because 7.905% of the original principal debt was paid by the Bankruptcy Trustee.

. . . .

31. Frost's documents, including the draw requests submitted by Choy

---

7. Exhibit 57A is not in the record. However, the properties are specifically identified in record exhibits 193, 194, and 220, which, in turn, reference backup materials in the record.

and others, [show] the roofing work was completed.

32. Windwater received the loan proceeds from Frost Bank to pay for roofing work done by Graziano Roofing. See Exhibit 220, which is incorporated herein for all purposes.

33. Thus, with regard to Frost Bank, construction draws or loan proceeds for roofing work and materials for the properties listed on Exhibit 220 total $87,517.72.

. . . .

35. The amount owed for the roofing work after the 7.905% reduction is $52,811.89. The reduction results from the bankrutpcy trustee paying 2.905% of the original debt.

. . . .

40. Windwater failed to pay Graziano Roofing for the roofing work that Graziano Roofing performed even though Windwater received construction loan proceeds from Frost Bank to pay for the roofing work.

41. Graziano Roofing is owed the principal sum of $131,796.09 for the roofing work that it performed for Windwater on properties where there were construction loans secured by liens on real property from Citibank and Frost Bank. See Exhibits 57A and 57C (The total due of $134,396.09 was reduced by $2,600.00 because Citibank's records show only 60% of the roofing work was completed at 7110 Harmony Cove.).

The challenged conclusions of law state:

8. Andrew Choy as a fiduciary or trustee of the construction trust funds had a duty to act for the benefit of any artisan, laborer, mechanic, contractor, subcontractor or material-man who labored or furnished labor or material for the construction (or repair) of an improvement on specific real property.

9. Andrew Choy as a fiduciary or trustee of construction trust funds, was obligated to ensure that the construction trust funds were properly distributed to the beneficiaries of the construction trust funds, in this case—Graziano Roofing.

10. Andrew Choy breached his duty to Graziano Roofing and he did not ensure that the construction trust funds were properly distributed to the beneficiary of the construction trust funds, in this case—Graziano Roofing.

11. Graziano Roofing, as a subcontractor of Windwater, furnished labor or material for the construction or repair of an improvement on specific real property in Texas and is a beneficiary of the construction trust funds.

. . . .

13. A corporate officer who has signature authority on a corporation's bank accounts and abides by instructions from another person or corporate entity to deliver construction trust funds has misapplied construction trust funds. Andrew Choy misapplied construction trust funds.

14. Andrew Choy knowingly misapplied the construction trust funds.

. . . .

16. The amount of construction loan proceeds (principal and interest) misapplied by Choy total $131,796.09, as of April 5, 2003.

Section 162.002, entitled, "Contractors as Trustees," provides, "A contractor, subcontractor, or owner or an officer, director,

or agent of a contractor, subcontractor, or owner, who receives trust funds or who has control or direction of trust funds, is a trustee of the trust funds." Tex. Prop. Code Ann. § 162.002 (Vernon 2007).

■ Choy testified that he was the President of Windwater and that he had control over the funds received from Frost Bank and Citibank. Furthermore, Adam Stanford, the Vice–President of Graziano, testified that he received checks from Windwater and that the checks were signed by Choy. Choy produced no contrary evidence. Based on this evidence, we conclude that Choy was a trustee of construction trust funds. *See C & G, Inc. v. Jones,* 165 S.W.3d 450, 455–56 (Tex. App.-Dallas 2005, pet. denied) (concluding that officers of company had control or direction of trust funds); *see also Nuclear Corp. of America v. Hale,* 355 F.Supp. 193, 197 (N.D.Tex.1973), *aff'd,* 479 F.2d 1045 (5th Cir.1973) (holding that company's president was trustee of trust funds because he had control and direction over funds).

■ Likewise, Graziano was properly classified as a beneficiary of trust funds. A subcontractor who furnishes labor or material for the construction or repair of an improvement on specific real property in this state is a beneficiary of any trust funds paid or received in connection with the improvement. Tex. Prop.Code Ann. § 162.003 (Vernon 2007). The evidence established that Graziano, a subcontractor, installed roofs on a number of homes for Windwater, including those homes for which recovery was sought. Choy produced no contrary evidence. We thus conclude that Graziano was a beneficiary of any trust funds paid or received in connection with its roofing services. *See id.*

Choy contends, however, that, as a trustee under the Act, he had no duty to pay out trust funds to a subcontractor who furnished labor or materials for the construction or repair of specific real property "unless and until certain events occur in a particular sequence." Specifically, Choy contends that Graziano had to submit "evidence that the labor and/or materials were provided *prior* to the receipt of trust funds and that the payment obligation arising therefrom is *due and payable within 30 days* of receipt of the trust funds." (Emphasis in original). He contends that section 162.031 of the Act, entitled "Misapplication of Trust Funds," "permits a recipient of loan proceeds to use such proceeds for any purposes whatsoever provided they do not have at the time such loan proceeds are received any outstanding 'current or past due obligations' as defined under Property Code Section 162.005(2)." He further contends that Graziano ignored the definition of "current or past due obligations" in section 162.005(2) and that there is a "complete absence of any evidence that complies with Act's definition of 'current and past due obligations.'" Choy states that the term "due and payable" "is limited to 'no later than 30 days following receipt of the trust funds.'" He contends that "[i]f an obligation is not due and payable within 30 days of receiving the trust funds then those funds are not trust funds under the definitions of the Trust Fund Act." Finally, Choy claims that "there is no evidence in the record to prove" that Windwater was obligated to Graziano for labor or materials furnished in the direct prosecution of work under a construction contract prior to the receipt of trust funds and that "such obligations were due and payable 30 days from the receipt of trust funds."

Section 162.031(a) of the Property Code provides,

(a) A trustee who, intentionally or knowingly or with intent to defraud,

directly or indirectly retains, uses, disburses, or otherwise diverts trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds, has misapplied the trust funds.

TEX. PROP.CODE ANN. § 162.031(a) (Vernon 2007).

Section 162.005 of the Property Code defines "current or past due obligations" as used in section 162.031 as "those obligations incurred or owed by the trustee for labor or materials furnished in the direct prosecution of the work under the construction contract prior to the receipt of the trust funds and which are due and payable by the trustee no later than 30 days following receipt of the trust funds." TEX. PROP.CODE ANN. § 162.005 (Vernon 2007).

Under the Code Construction Act, it is presumed that in enacting a statute the Legislature intended that the entire statute be effective, that the result be just and reasonable, and that it be feasible of execution and in the public interest. TEX. GOV'T CODE ANN. § 311.021 (Vernon 2005). In construing a statute, the court considers the object sought to be attained and the consequences of a particular construction. *Id.* § 311.023 (Vernon 2005). Also, words are given their ordinary meaning. *Id.* § 312.002; *Fitzgerald,* 996 S.W.2d at 865. Therefore, in construing a statute, we generally focus on and will follow the plain language of the statute unless following the plain language would lead to absurd and unintended consequences. *Fleming Foods, Inc. v. Rylander,* 6 S.W.3d 278, 284 (Tex.1999).

■ As a trustee of the funds borrowed by Windwater from First American Bank and Frost Bank for the improvement of specific real property secured in whole or in party by a lien, Choy clearly had a duty under the Act to pay out trust funds for all "current and past due obligations" owed for labor or materials furnished by Graziano under the construction contract for work completed on specific properties. *See* TEX. PROP.CODE ANN. §§ 162.001, 162.002, 162.003, 162.031. To misapply trust funds under the Act, the trustee must have disbursed or otherwise diverted trust funds without first fully paying all "current or past due obligations," namely "those obligations incurred or owed by the trustee for labor or materials furnished in the direct prosecution of the work under the construction contract prior to the receipt of the trust funds and which are due and payable by the trustee no later than 30 days after receiving the trust funds." TEX. PROP.CODE ANN. §§ 162.005, 162.031.

That section 162.005(2) defines "due and payable obligations" to include all obligations "due and payable by the trustee no later than 30 days following receipt of the trust funds" does *not* mean, as Choy contends, that "[i]f an obligation is not due and payable within 30 days of receiving the trust funds then those funds are not trust funds under the definitions of the Trust Fund Act." Nor does it mean that the trustee has no obligation to pay out trust funds it has requested from a bank pursuant to a construction loan to pay an obligation unless the beneficiary of the funds proves that the "obligations were due and payable 30 days from the receipt of trust funds," and that the trustee has no obligation to pay obligations already due and payable when an invoice was sent to the trustee triggering the trustee's draw request for construction loan funds, as here. An obligation that is due and payable by the trustee at the time he requests construction loan funds to pay an invoice he has received for "obligations incurred or owed by the trustee for labor or materials furnished in the direct prosecution of the

work under the construction contract prior to the receipt of the trust funds" is necessarily "due and payable by the trustee no later than 30 days following receipt of the trust funds," because it was *already* due and payable when the trust funds were requested by the trustee from the bank and was the cause for the transfer of the funds by the bank so that the obligation could be paid.

Any construction of the statute such as that Choy urges upon the Court would be absurd. First, it would remove from the definition of "current and past due obligations" all past due obligations, rendering the statutory definition of "past due obligations" meaningless. Second, it would mean that borrowers like Windwater could request construction loan funds on the basis of an invoice for completed work, as here, and not have to pay the beneficiary whose invoice supported the borrower's draw request because the beneficiary invoiced the borrower *before* it requested the funds and did not specify that it required payment within 30 days *after* the borrower received the funds that were released by the bank to the borrower on the basis of the invoice. We find no basis for adding this requirement to the language of the statute. *See Fitzgerald,* 996 S.W.2d at 867.

■ We hold that, by the plain language of the Act, the words "due and payable . . . no later than 30 days" after a trustee's receipt of construction trust funds include invoices already due and payable at the time trust funds are requested by a trustee. *See* TEX. PROP.CODE ANN. §§ 162.005, 162.031.

The evidence supports the challenged findings under the proper construction of the statute. Specifically, the Citibank and Frost Bank records admitted into evidence and cited above in response to the first part of Choy's first issue establish that at the time Frost Bank and Citibank disbursed funds to Windwater for construction costs for the 21 properties identified in Graziano's petition Graziano had supplied roofing materials and performed roofing services on those properties; the roofing was counted as complete on 20 of those 21 properties and 33.5% complete out of the necessary 35% required by Citibank for work to be counted as complete on the 21st house; Windwater made draws upon Citibank and Frost Bank for roofing supplies and services as the work was completed; and Citibank and Frost Bank immediately funded each draw request by wire transfer to Windwater.

Graziano also produced a "Summary of Draw Request, Wire Transfer Form and Wire Transfer Confirmation" for Citibank, summarizing this information, as well as a "Summary of Completion and Dollars Disbursed or Funded for Citibank and Graziano Roofing's Invoice Amount," referencing exhibits and summarizing the percentage of completion of each property, the amount drawn, the amount of Graziano's invoice for the property, the amount of reduction from the original invoice, and the funds wired to Windwater. Similarly, it produced a "Summary of Completion and Funds Disbursed from Frost Bank," stating the date of the draw request for roofing work on each property, the Windwater agent making the request, the draw amount, the status of the roof as complete, the source exhibits showing the draws funded, the amount of Graziano's invoice, and the amount of the invoice reduction. No objection was made to any of these exhibits.

■ These exhibits show that Windwater's obligation to pay Graziano for the properties for which Graziano seeks recovery under the construction contract was owed by the trustee for labor and materials furnished in Graziano's direct prosecu-

tion of the work on those properties prior to the receipt of the trust funds; that Graziano invoiced Windwater for its completed roofing work that was due and payable in specified amounts recited in the invoices, triggering Windwater's draw requests for specified amounts of construction funds to pay those obligations; and that, promptly upon receipt of Windwater's draw requests for construction loan funds, Citibank and Frost Bank transferred the requested funds to Windwater's account at Frost Bank so that it could pay the obligations it had incurred and that were due and payable to Graziano.

Choy produced no evidence to the contrary.

Viewing the evidence in the light most favorable to Graziano and indulging every reasonable inference in its favor, we conclude that the evidence is legally sufficient to support the challenged findings. *See Associated Indem. Corp.*, 964 S.W.2d at 285–86. Considering and weighing all of the evidence, we further conclude that the challenged findings are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, and therefore the evidence in support of the challenged findings is factually sufficient. *Ortiz*, 917 S.W.2d at 772.

Choy contends, however, that even when obligations are current or past due under the statute, the Act "does not prioritize what beneficiaries get paid first from loan proceeds when there are several beneficiaries," nor does it "provide that a trustee has misapplied trust funds where the loan receipts are simply insufficient to satisfy all then current or past due obligations." This argument is inapplicable in this case because there is no evidence of additional beneficiaries entitled to the same draw proceeds whom Choy failed to pay or whom Choy paid instead of paying Graziano from "simply insufficient" funds.

Rather, the record evidence shows that Windwater made draws on Citibank and Frost Bank pursuant to its contracts with them to pay invoices received from Graziano for completed roofing work on specified properties and that it did not pay Graziano. Choy testified that, Tan Yu, the owner of Windwater, of which Choy was president, and Lake Olympia, started removing money from the commingled funds of the two companies, amounting ultimately to $4.732 million; that Tan Yu "possibly" took overseas some of the funds received from the draw requests Windwater made on the banks to pay its contractors; and that he, Choy, knew the loan construction proceeds owed to Graziano were taken overseas because "[t]his particular bank, there's no separate account. It's just the account for the company." Choy admitted he knew that Graziano did not get paid for work it had completed.

 Choy also attempts to inject into the proof of a violation of section 162.031(a), governing the misapplication of construction trust funds, a requirement that the beneficiary—here, Graziano—must provide direct evidence of the specific dates on which it performed work on each property "establishing precisely when labor or materials were furnished by a beneficiary to a particular property and the precise terms of payment agreed to with the owner." Choy also contends that Graziano had to introduce into evidence its contract with Windwater "with specific payment terms." Choy's attempt to add to the requirements supported by the plain language of section 162.031(a) is no more supportable here than his attempt to add requirements to the interpretation of sections 162.001 and 162.005(2) of the Act. *See Fitzgerald*, 996 S.W.2d at 865; TEX. GOV'T CODE ANN. §§ 311.023; 312.002. We decline to impose additional requirements to the proof of a violation of section

162.031(a) of the Act beyond those supported by the plain language of the statute.

### 2. Evidence Tracing Funds Received and Disbursed

■ Although there is no tracing requirement in the language of the statute, Choy also contends that "Graziano [had to] offer evidence tracing funds from any loan proceeds or bank accounts to establish the timing of the receipt and alleged disbursement of funds." Choy relies on *Kirschner v. State*, 997 S.W.2d 335 (Tex.App.-Austin 1999, pet. ref'd), as support for his claim.

In *Kirschner*, the contractor, Kirschner, was building a home for the buyers and sending bills for labors and materials. Once the buyers believed that Kirschner was billing them for materials that they had already paid for and labor that had never been performed, they fired him. It was later determined that Kirschner had not paid 17 subcontractors, prompting an indictment by the State. After he was convicted, Kirschner appealed, arguing that the evidence was legally insufficient to show that he misappropriated trust funds. This Court concluded that the State offered no evidence as to "when ten of the twelve subcontractors and vendors named in the indictment furnished the labor or materials for which they were not paid by Kirschner. Absent this evidence, the State failed to prove that there was a current or past due obligation owed these ten alleged beneficiaries at the time Kirschner received trust funds." *Id.* at 341. However, the State introduced into evidence copies of invoices submitted by the two remaining subcontractors listed in the indictment, together with evidence that Kirschner had made draws on loan proceeds committed to those projects and had not used the trust funds he received to pay

those obligations. *Id.* at 341–42. Bank records and Kirschner's own cost documentation showed that he wrote many checks against trust funds after the obligations to the two sub-contractors became payable, most of them payable to beneficiaries of the trust, but one payable to his wife and one to himself. *Id.* at 342. Because Kirschner paid himself before paying his obligations to trust beneficiaries, the court held that the subcontractors had established a misapplication of trust funds. *Id.* The court *rejected* Kirschner's argument that the State was required to trace the flow of funds and prove that any questionable payments were not, in fact, payments directly related to the project. *Id.* at 342–43.

Here, the record contains ample, unrebutted evidence that Graziano provided labor and materials for the roofing work on the 21 projects for which he sought recovery in this lawsuit; that it invoiced the work on each of these properties upon completion for specific amounts of money,[8] which then became due and owing, triggering construction loan draw requests by Windwater to Citibank and Frost Bank; that Citibank and Frost Bank promptly responded to each draw request by Windwater and wire transferred the money to its account; and that Choy, as trustee for Windwater with control over its funds, did not pay the invoices. We conclude that Choy's argument that Graziano was required to trace the funds received by Windwater and disbursed is an attempt to add requirements to the statute without support in the plain language of the statute or in case law and is without merit. *See Fitzgerald*, 996 S.W.2d at 865.

### C. Misapplication of Trust Funds

■ Finally, Choy argues that no evidence, or factually insufficient evidence,

---

8. Or, in the case of 7110 Harmony Cover, just prior to completion.

shows that he misapplied any of the alleged trust funds so as to be personally liable under section 162.031(a) of the Act. He contends that "[t]o prove a misapplication, Graziano needed to establish that some amount of a particular loan draw was not used to pay suppliers to the property securing the loan whose obligations were due and payable by Windwater within 30 days after Windwater's receipt of the loan proceeds." Thus, Choy argues that findings of fact 25, 26, 37–39 were supported by insufficient evidence and that conclusions of law 12–14 and 16 were erroneous.

The findings of fact challenged in this section state:

25. Andrew Choy directed that the construction loan proceeds from Citibank be directed or paid to someone other than Graziano Roofing.

26. Andrew Choy knowingly used, disbursed, or otherwise diverted the construction trust funds owed to Graziano Roofing, so that Graziano Roofing did not receive the trust funds.

. . . .

37. Andrew Choy directed that the construction loan proceeds from Frost Bank be directed or paid to someone other than Graziano Roofing.

38. Andrew Choy knowingly used, disbursed, or otherwise diverted the construction trust funds from Frost Bank owed to Graziano Roofing, so that Graziano Roofing did not receive the trust funds from Frost Bank.

39. When the Frost Bank construction loan proceeds were received by Windwater, Andrew Choy decided to utilize the loan proceeds for purposes other than to pay the construction costs on the homes made the basis of this lawsuit.

The conclusions of law challenged in this section state:

12. Andrew Choy knowingly retained, used, disbursed, or otherwise diverted the construction trust funds without first fully paying all current or past due obligations incurred by Windwater and owed to the beneficiary of the construction trust funds, Graziano Roofing.

. . . .

14. Andrew Choy knowingly misapplied the construction trust funds.

. . . .

16. The amount of construction loan proceeds (principal and interest) misapplied by Choy total $131,796.09 as of April 5, 2003.

Choy contends that "[a]lthough the phrase 'directly or indirectly retains, uses, disburses, or otherwise diverts trust funds' is not statutorily defined, case law provides guidance on evidence need to prove this element under Property Code [section] 162.031(a)." Specifically, he contends that, in *Kirschner*, the court found that checks paid to non-beneficiaries at the time current and past due obligations remained outstanding evinced a misapplication of trust funds by the trustee. *See Kirschner*, 997 S.W.2d at 342. Choy also cites *Morelli v. State*, 9 S.W.3d 909, 912 (Tex.App.-Austin 2000, pet. ref'd), for the proposition that no segregation of funds by construction projects is required and that the intent to defraud must be shown to establish the misapplication of funds. We find both *Kirschner* and *Morelli* to be inapplicable because they do not correspond to the circumstances of this case.

Here, Choy testified that he wired over $4.3 million to Tan Yu. He testified that he wired money that should have gone to contractors and that he and Tan Yu knew that contractors were not getting paid.

He admitted that, on some properties, Graziano was not getting paid. There is no evidence that trust funds received from Frost Bank and Citibank in response to Windwater's draw requests for funds to pay Graziano's invoices were used to pay any of those invoices.

To prove the misapplication of construction trust funds, the plain language of the statute required only that (a) a trustee "intentionally or knowingly or with intent to defraud directly or indirectly" (b) "retain[ ], use[ ], disburse[ ], or otherwise divert[ ] trust funds" (c) "without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries." TEX. PROP.CODE ANN. § 162.031(a). Viewing the evidence in the light most favorable to Graziano and indulging every reasonable inference in its favor, we conclude that the evidence is legally sufficient to support the challenged findings. *See Associated Indem. Corp.*, 964 S.W.2d at 285–86. Considering and weighing all of the evidence, we further conclude that the challenged findings are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust, and therefore the evidence in support of the challenged findings is factually sufficient. *Ortiz*, 917 S.W.2d at 772.

We overrule Choy's first issue.[9]

## II. Intra–Company Transfers of Funds

In his second issue, Choy argues that the "trial court erred in concluding that liability exists under the Trust Fund Act of intra-company transfers of funds."

Choy does not challenge a specific finding of fact or conclusion of law. Rather, he states that although Choy testified that he and others had the authority to and did wire money to Tan Yu, the owner of lake Olympia and Windwater, of which Choy was president, "there was no testimony or documentary evidence indicating exactly when these transfers were made, the sources of the transferred funds, the amount of each transfer, and who made the individual transfers." Choy contends that Graziano failed to carry its burden of proving that funds were "diverted, disbursed, or misapplied." He further contends that "the fact that the funds were never disbursed by Mr. Choy, but remained within the corporate structure, should not cause Mr. Choy to be held personally liable under the Trust Fund Act."

Choy again attempts to add requirements of proof not contemplated by the plain language of the case law, contrary to the canons of code construction. *See Fitzgerald*, 996 S.W.2d at 865; TEX. GOV'T CODE ANN. §§ 311.023; 312.002. Moreover, the authorities he cites are inapplicable under the circumstances of this case. There is no evidence that construction trust funds received from Frost Bank and Citibank to pay Graziano's invoices "remained within the corporate structure." Rather, there is unrefuted evidence that they were received by Windwater in response to draw requests made by Windwater to the banks to pay Graziano's invoices for completed roof work, that they were not used to pay Graziano, that they were commingled with

9. In a sub-point of his first issue, Choy argues that Graziano did not plead a claim relating to 7126 Turtle Lagoon Row in its petition and therefore the trial court should not have awarded damages on this property. Graziano responds that the issue was tried by consent. *See* TEX.R. CIV. P. 67 (trial by consent occurs when issues not raised by pleadings are tried without objection). We agree. Graziano introduced evidence that 7126 Turtle Lagoon Row was one of the properties where it furnished labor and materials and that it had not received payment. Choy did not object to Graziano's evidence and thus tried this issue by consent.

all corporate funds, and that $4.3 million of corporate funds were transferred overseas to Tan Yu, the owner of Windwater, and were not used for any corporate purpose. Proof of liability for misapplication of trust funds under the plain language of section 163.931(a) of the Act requires no more. In particular, there is no requirement that the beneficiary of trust funds must prove "exactly when these transfers of trust funds were made" by the company to a recipient other than the plaintiff, "the sources of the transferred funds, the amount of each transfer, and who made the individual transfers."

■■■ Again, we "may add words into a statutory provision only when necessary to give effect to clear legislative intent," and "[o]nly truly extraordinary circumstances showing unmistakable legislative intent should divert us from the enforcing the statute as written." *Fitzgerald,* 996 S.W.2d at 867. There is no such intent expressed here, and increasing the beneficiary's burden of proof of the misapplication of trust funds by requiring him to prove the exact method by which a *trustee's* disposed of trust funds not used to pay the beneficiary—proof within the *trustee's* control—is plainly contrary to the legislative intent that the beneficiary prove only that the trustee "intentionally or knowingly or with intent to defraud, directly or indirectly retain[ed], use[d], disburse[d], or otherwise divert[ed] trust funds without first fully paying all current or past due obligations incurred by the trustee to the beneficiaries of the trust funds." TEX. PROP.CODE ANN. § 162.031(a).

We overrule Choy's second issue.

## III. Pre-judgment Interest

■■■ In his third issue, Choy argues that the trial court erred in awarding Graziano prejudgment interest based on the interest rate contained in the Texas Prompt Pay Act. Choy contends that conclusions of law 15 and 17 are erroneous.

The relevant conclusions of law provide,

15. Interest on debts owed to beneficiaries of the construction trust fund statute runs at ONE AND ONE–HALF (1.5%) percent per month.

. . . .

17. Pre-judgment interest continues to accrue to the date of judgment at the per diem rate of $5,4162 from April 5, 2003 to the date of judgment, that date being June 7, 2007.

Graziano responds that Choy never raised this argument at trial and that therefore the issue is waived.[10] In his reply brief, Choy does not respond to Graziano's waiver argument.

To make these claims on appeal, Choy was required to present these complaints to the trial court. *See* TEX.R.APP. P. 33.1 (preserving error); *see also Allright, Inc. v. Pearson,* 735 S.W.2d 240, 240 (Tex.1987) (error regarding award of prejudgment interest must be preserved); *Miller v. Kendall,* 804 S.W.2d 933, 945 (Tex.App.-Houston [1st Dist.] 1990, no writ) (motion to amend or correct judgment or motion for new trial is proper vehicle for preserving error in judgment); *Wohlfahrt v. Holloway,* 172 S.W.3d 630, 639 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (error regarding postjudgment interest is waived if not complained of at trial level). We

---

10. *In its third amended petition, Graziano pled for prejudgment interest pursuant to section 28.001 et seq. of the Texas Property Code. See* TEX. PROP.CODE ANN § 28.001 (Vernon 2000). *Section 28.004 provides, "An unpaid amount required under this chapter begins to accrue interest on the day after the date on which the payment becomes due." Id.* § 28.004(a) (Vernon 2000).

conclude that by failing to object to the award of prejudgment interest at trial, the complaint has been waived.

We overrule Choy's third issue.

### Conclusion

We affirm the judgment of the trial court.

Justice JENNINGS, concurring in the judgment only.