CARDIAC PERFUSION SERVICES,
INC. and Michael Joubran,
Appellants/Cross–Appellees

v.

Randall HUGHES, Appellee/Cross–
Appellant.

No. 05–10–00286–CV.

Court of Appeals of Texas,
Dallas.

July 26, 2012.

Rehearing Overruled Oct. 16, 2012.

Gordon Bogen, Harvey G. Joseph, Law Offices of Harvey G. Joseph, Lyndon F. Bittle, Monica Wiseman Latin, Thomas F. Allen, Carrington, Coleman, Sloman, & Blumenthal, L.L.P., Dallas, TX, for Appellants/Cross–Appellees.

David R. Weiner, Weiner Law Firm, Jeremy C. Martin, Malouf & Nockels, LLP, Georganna L. Simpson, Georganna L. Simpson, P.C., Dallas, TX, for Appellee/Cross–Appellant.

Before Justices FITZGERALD, FRANCIS, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

These are cross-appeals from a final judgment rendered after a jury trial in an employment and shareholder dispute involving multiple claims and counterclaims. Appellants and cross-appellees Cardiac Perfusion Services, Inc. (CPS) and Michael Joubran raise six issues on appeal complaining about (1) the court-ordered redemption of appellee Randall Hughes's minority interest in CPS for fair value, rather than book value, based on a finding of shareholder oppression, (2) the award of prejudgment and postjudgment interest, and (3) the award of attorney's fees. Ap-

pellee and cross-appellant Hughes raises one issue on cross-appeal complaining about the trial court's refusal to render judgment in favor of Hughes on his claim against Joubran for breach of fiduciary duty. We affirm the trial court's judgment.

## BACKGROUND

Joubran and Hughes are cardiac perfusionists; they operate heart-lung machines during open-heart surgery. In May 1991, Joubran founded CPS and hired Hughes as his first employee. At CPS's annual meeting in June 1992, Joubran, as the sole shareholder, voted to offer Hughes 10% of CPS's total shares issued and outstanding for the purchase price of $25,000. Hughes accepted the offer and bought the shares. In July 1992, Joubran and Hughes entered into a Buy–Sell Agreement. The Buy–Sell Agreement restricted the sale or transfer of any shares of CPS and required the shareholders of CPS to purchase the stock of another shareholder upon "the severance of [that] shareholder's employment relationship with [CPS]," with the purchase price to be calculated using the book value of the shares as of the fiscal year preceding the termination. A dispute later arose between the parties, and Hughes's employment with CPS was terminated in August 2006.[1]

One day after Hughes's employment was terminated, CPS and Joubran sued Hughes. CPS sought to recover damages from Hughes for breach of fiduciary duty and tortious interference with its contract with Methodist Hospital. Joubran asked the trial court to declare that (1) Joubran's obligation to purchase Hughes's stock is governed by the Buy–Sell Agreement, and (2) any amounts owed to Hughes for the purchase of his stock "shall be reduced or offset for any damages which Hughes'[s] conduct has caused CPS." Hughes counterclaimed against Joubran for "oppress[ing] Hughes as the minority shareholder." Among other allegations, Hughes alleged that Joubran "utilized the corporation as his personal vehicle to pursue his own self interests" and "misused funds of [CPS] for his own personal gain." Hughes also counterclaimed for breach of fiduciary duty and alleged that Joubran had denied him access to CPS's books and records.

The trial court held a four-day jury trial during which nine witnesses testified. At the conclusion of trial, the jury found in favor of Hughes on CPS's claims for tortious interference with contract and breach of fiduciary duty. With respect to Hughes's counterclaim against Joubran for shareholder oppression, the jury found that Joubran (1) suppressed payment of profit distributions to Hughes, (2) paid himself excessive compensation from CPS's corporate funds, (3) improperly paid his family members using CPS funds, (4) used CPS funds to pay his personal expenses, (5) used his control of CPS to lower the value of Hughes's stock, and (6) refused to let Hughes examine CPS's books and records. The jury found that the fair value of Hughes's shares was $300,000. With respect to Hughes's claim against Joubran for breach of fiduciary duty, the jury essentially found that there was no fiduciary relationship between Hughes and Joubran. The jury went on, however, to answer additional, conditional questions in which they appeared to find that Joubran breached his fiduciary duty to Hughes, and that Hughes was entitled

---

1. In 1997, Joubran and Hughes entered into another stock-purchase agreement in connection with certain estate and succession planning. The parties appear to agree, however, that the terms of the 1997 agreement were not triggered by the termination of Hughes's employment.

to actual and exemplary damages. Based on the jury's findings, the trial court issued findings of fact and conclusions of law in which the trial court concluded that Joubran engaged in shareholder oppression and that the most equitable remedy was to require Joubran and CPS to redeem Hughes's shares at what the jury found to be the fair value: $300,000.

In its final judgment, the trial court ordered that CPS and Joubran take nothing on their claims against Hughes, including Joubran's claims for declaratory judgment. And based on the jury's finding that there was no fiduciary relationship between Hughes and Joubran, the trial court also ordered that Hughes take nothing on his claim against Joubran for breach of fiduciary duty. Based on the jury's findings concerning Joubran's oppressive conduct, the trial court concluded that Joubran engaged in shareholder oppression and that the most equitable remedy was to require Joubran and CPS to redeem Hughes's shares at what the jury found the fair value to be: $300,000. The trial court also awarded Hughes prejudgment interest, postjudgment interest, and attorney's fees.

## CPS AND JOUBRAN'S APPEAL

### FIRST ISSUE

In their first issue CPS and Joubran argue that the trial court erred when it ordered them to redeem Hughes's shares in CPS at "fair value," rather than at book value, as required under the terms of the Buy–Sell Agreement. Stated differently, CPS and Joubran argue that the trial court "erred by holding that the equitable doctrine of shareholder oppression nullified the [Buy–Sell Agreement]."

### Applicable Law

■ The term "shareholder oppression" is expansive and covers "a multitude of situations dealing with improper conduct." *Davis v. Sheerin*, 754 S.W.2d 375, 381 (Tex.App.-Houston [1st Dist.] 1988, writ denied). This Court and other Texas courts have generally recognized two non-exclusive definitions for shareholder oppression:

> majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

> burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*See, e.g., Ritchie v. Rupe*, 339 S.W.3d 275, 289 (Tex.App.-Dallas 2011, pet. filed). When the facts are in dispute, the jury determines what acts occurred, but the trial court determines whether those acts constitute shareholder oppression and exercises its equitable authority to decide the appropriate remedy. *See id.* at 285, 289; *see also Davis*, 754 S.W.2d at 380.

### Standard of Review

■ We review a trial court's exercise of its equitable authority under an abuse of discretion standard. *See Ritchie*, 339 S.W.3d at 285. A trial court abuses its discretion when it acts arbitrarily or without reference to any guiding rules and principles. *Id.* But we review de novo the question of whether the trial court properly concluded that there was shareholder oppression because that conclusion is a legal conclusion. *Id.* at 289.

### Arguments of the Parties

This case was tried and briefed before this Court issued its opinion in *Ritchie*.

During oral argument the parties agreed that our decision in *Ritchie* applies, at least to some extent, to the facts and arguments raised in this case.

To support their argument that the trial court erred when it did not enforce the terms of the Buy–Sell Agreement and instead ordered the redemption of Hughes's shares at fair value, CPS and Joubran primarily rely on *Fortis Benefits v. Cantu,* 234 S.W.3d 642 (Tex.2007). *Fortis Benefits* was an insurance subrogation case in which the supreme court held that an insurer who agrees to contractual subrogation could not recover under the equitable "made-whole" doctrine because, "[w]here a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Id.* at 648–49.

CPS and Joubran also cite more generally to two other cases: *Fortune Production Co. v. Conoco, Inc.,* 52 S.W.3d 671 (Tex.2000); and *City of The Colony v. North Texas Municipal Water District,* 272 S.W.3d 699 (Tex.App.-Fort Worth 2008, pet. dism'd). In *Fortune Production* the supreme court held that the written contracts in that case for the sale of "the entire stream of gas" produced from the plaintiffs' natural gas wells foreclosed any claim for unjust enrichment relating to a particular part of that gas stream because "[a] cause of action for unjust enrichment is not available to recover payments in addition to the contract price the parties agreed upon for the entire stream." 52 S.W.3d at 684–85. Likewise, in *The Colony* the court of appeals cited *Fortune Production* and held that the remedy of unjust enrichment was not available to the plaintiff "because there is a valid, express contract governing the dispute, and recovery under this equitable doctrine would be in-

consistent with the express terms of the Contract." 272 S.W.3d at 731.

In response, Hughes relies on *Hayes v. Olmsted & Associates, Inc.,* 173 Or.App. 259, 21 P.3d 178 (2001), which involved a minority shareholder's claim for shareholder oppression. In *Hayes,* the trial court found that the defendant majority shareholders engaged in oppressive conduct and one of the issues on appeal was what value to assign to the plaintiff's shares. The defendants argued that the appropriate value was $67 per share based on the terms of a stock purchase agreement that had been "consistently applied in redeeming the shares of other shareholders." 21 P.3d at 181, 182. The plaintiff, on the other hand, argued that, because the defendants engaged in shareholder oppression, he was entitled to "the value of his proportionate interest in the corporation as a going concern, without consideration of any minority or marketability discounts that might be applicable in other circumstances." *Id.* at 180. The appellate court agreed with the plaintiff. The court concluded that the value under the stock purchase agreement did not apply in the context of shareholder oppression, and that the plaintiff was "entitled to be compensated for the fair value of his stock, without regard to discounts applicable to other settings." *Id.* at 189.

In their reply brief, CPS and Joubran argue that *Hayes* does not apply because, under Oregon law, people with a controlling interest in a closely held corporation owe fiduciary duties to minority shareholders as a matter of law, and "no such duty exists in Texas absent a special relationship between the parties." But even if Texas and Oregon law differ as to claims for breach of fiduciary duty, this distinction is not material here because *Hayes* was not decided on the plaintiff's separate claim for breach of fiduciary duty. In-

stead, in *Hayes* the trial court found, and the appellate court agreed, that the defendants had engaged in shareholder oppression; and the equitable remedy of a buy-out for fair value in that case was based on the oppression claim. *Id.* at 262, 272, 275–76, 280, 21 P.3d 178. And, like Oregon, Texas recognizes a cause of action for shareholder oppression. *See Ritchie,* 339 S.W.3d at 289.

CPS and Joubran also argue that the facts in *Hayes* are distinguishable because the plaintiff in *Hayes* was actively involved in the corporation as an officer, director, and voting shareholder until other shareholders formed an unauthorized "executive committee" and forced him out. CPS and Joubran do not explain, however, why this factual distinction is material.

CPS and Joubran also cite *In re White,* 429 B.R. 201 (Bankr.S.D.Tex.2010), in which the bankruptcy court concluded that a buy-out of an employee's stock using the valuation method contained in the company's shareholders' agreement was one of two appropriate equitable remedies under Texas law for shareholder oppression. In that case, however, the court explained that the valuation method contained in the shareholders' agreement was the only viable valuation method because "no witness testified that it was valid to utilize the book value of the corporation," and the testimony from the employee's expert concerning an alternative "income capitalization" valuation was inconsistent and not credible. 429 B.R. at 216–17.

■ We conclude that the cases cited by CPS and Joubran are distinguishable because they do not involve a trial court's exercise of its equitable discretion in the context of a claim for shareholder oppression. Although Texas courts have held that a party to a contract cannot recover equitable relief inconsistent with that contract, here Hughes claimed that the book value of his shares was reduced by Joubran's oppressive conduct and Hughes sued for shareholder oppression, not breach of contract. In the context of a claim for shareholder oppression, courts have equitable power to order a buy-out at fair value. *See Davis,* 754 S.W.2d at 380 (in the context of shareholder oppression, "Texas courts, under their general equity power, may decree a 'buy-out' in an appropriate case where less harsh remedies are inadequate to protect the rights of the parties").

In *Ritchie* we noted that the "enterprise value" method for determining fair value would be appropriate under these circumstances:

> Two types of "fair value" are enterprise value and fair market value. The enterprise value of stock is determined by the value of the company as a whole and ascribing to each share its pro rata portion of that overall enterprise value. Enterprise value does not include a discount based on the stock's minority status or lack of marketability.
>
> . . .
>
> Enterprise value has been seen as the appropriate valuation when a minority shareholder, with no desire to leave the corporation, has been forced to relinquish his ownership position by the oppressive conduct of the majority.

*Ritchie,* 339 S.W.3d at 300–01. In this case, the jury was asked the following question in connection with the value of Hughes's minority interest in CPS:

> What sum of money, if any, if paid now in cash, do you find to be the fair value of the CPS shares owned by Hughes?
>
> You are instructed that "fair value" means the value of Hughes's shares in CPS determined:

a. as of the date Hughes'[s] counterclaim was filed on September 21, 2006;

b. using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

c. without imposing any discount for lack of marketability or minority status.

Answer in dollars and cents, if any.

The jury answered, "$300,000."

To determine whether the trial court abused its discretion in this case, the question we must answer is whether the trial court acted arbitrarily or without reference to any guiding rules or principles when it exercised its equitable discretion and ordered the redemption of Hughes's shares for fair value. *See Ritchie*, 339 S.W.3d at 285. In this case the trial court instructed the jury to use the valuation method we sanctioned in *Ritchie*. And our sister court has explained that "[a]n ordered 'buy-out' of stock at its fair value is an especially appropriate remedy [for shareholder oppression] in a closely-held corporation." *Davis*, 754 S.W.2d at 381. As a result, we cannot conclude that the trial court acted arbitrarily or without reference to any guiding rules or principles when it exercised its equitable discretion and ordered the redemption of Hughes's shares for fair value.

We resolve CPS and Joubran's first issue against them.

SECOND AND THIRD ISSUES

■ In their second issue CPS and Joubran argue that Hughes's claim for shareholder oppression is barred as a matter of law "by the fundamental principle of Texas law that a shareholder has no independent claim for injury to a corporation, including a closely-held corporation." In their third

issue CPS and Joubran argue that "[t]he lack of either a formal or informal fiduciary duty owed by Joubran directly to Hughes is fatal to Hughes'[s] claim [for shareholder oppression]."

■ In a jury trial, a matter-of-law issue must be preserved through a motion for instructed verdict, a motion for judgment notwithstanding the verdict, an objection to the submission of the question to the jury, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial. *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 141 (Tex. App.-Fort Worth 2011, pet. denied). CPS and Joubran filed a "Motion to Disregard Certain Jury Findings and/or Motion for Judgment Notwithstanding the Verdict" and a motion for new trial, but did not mention these arguments raised in their second and third issues on appeal. And CPS and Joubran do not argue that the trial court was otherwise presented with a specific request to rule on these arguments. As a result, we do not address these issues. *See, e.g., Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 476 (Tex.App.-Fort Worth 2004, no pet.).

We resolve CPS and Joubran's second and third issues against them.

FOURTH ISSUE

In their fourth issue CPS and Joubran raise three main complaints regarding the testimony of Travis Keath, Hughes's valuation expert. First, they argue that Keath's testimony concerning the "fair value" of Hughes's stock "was not supported by a coherent measure of value." Second, they argue that Keath's testimony was conclusory and therefore legally insufficient. And third, they argue that Keath's valuation opinion is wrong because it is based on an erroneous assumption that CPS is an S corporation.

■ The supreme court has explained that "conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony." *City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex.2009) (citing *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 232 (Tex.2004)). If there is no basis offered for the expert's opinion, or if the basis offered provides no support, the opinion is considered conclusory and not probative evidence, and the complaint can be raised for the first time on appeal. *Id.* at 818. By contrast, if the opinion has a supporting basis, but the opponent challenges the reliability of the opinion, an objection "must be timely made so that the trial court has the opportunity to conduct this analysis"—because the challenge requires the trial court to evaluate the underlying methodology, technique, or foundational data. *Id.* at 817 (quoting *Coastal Transp. Co.,* 136 S.W.3d at 233).

### First Complaint: Keath's "Measure of Value"

CPS and Joubran's first complaint in their fourth issue—about Keath's "measure of value"—is a complaint about reliability and would require this Court to evaluate Keath's underlying methodology and foundational data. For example, CPS and Joubran argue that Keath (1) should have "exclude[d] damages to the corporation from the calculation of fair value," and (2) should not have considered CPS's balance sheets and income statements from after the date of Hughes's termination. Because CPS and Joubran complain about reliability and did not raise these arguments below, we do not address their first complaint in their fourth issue. *See id.*

### Second Complaint: Keath's Testimony Was Conclusory

■ CPS and Joubran's second complaint in their fourth issue is that Keath's testimony was conclusory and amounted to no evidence. We disagree. CPS and Joubran argue that Keath's opinions are conclusory because (1) Keath did not compare Joubran's compensation with companies as small as CPS or with Joubran's "peers in other perfusion service companies"; (2) CPS and Joubran's expert, Lane McDaniels, disagreed with Keath about whether Joubran's quarterly bonuses should be characterized as dividends; (3) Keath "did not describe his 'discounted cash flow analysis' to the jury"; and (4) Keath failed to consider relevant factors including "[t]he controlling effect of the 1992 Buy–Sell Agreement," the "unstable nature" of CPS's business, and "the lack of goodwill attaching to the corporation itself, apart from the professional goodwill of either Joubran or Hughes." These criticisms, however, each of which was the subject of cross-examination, do not render Keath's opinions conclusory. Keath "did not simply state his conclusion without any explanation, or ask jurors to 'take my word for it.'" *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 (Tex.2008) (internal footnote citations omitted). To the contrary, Keath gave detailed testimony about his valuation opinions and the relevant facts supporting those opinions.

For example, Keath testified that he reviewed several boxes of documents in connection with his opinions, including pleadings and deposition transcripts, documents produced by CPS and Joubran, and market-based and economic information, including surveys related to executive compensation. He also explained that he has had 20 years of experience doing "business valuation work" and that he used standard valuation methodology that is customarily used by valuation experts.

Based on his review of Joubran's deposition transcript and documents produced by

CPS, Keath identified three categories of questionable expenses: (1) salaries paid to Joubran's college-age children, (2) excessive compensation paid to Joubran, and (3) certain credit card charges. First, with respect to Joubran's children, Joubran testified that CPS paid each of them an annual salary of $24,000 to prepare certain reports, and Keath calculated that CPS paid approximately $325,615 total in salaries to Joubran's children. Keath also testified that he was told that CPS did not terminate anyone else's employment when Joubran's children were hired, and CPS did not hire any employees to replace Joubran's children when they left the payroll.

Second, with respect to Joubran's compensation, Keath explained to the jury that when valuing a closely held corporation, he always looks at how the owners compensate themselves "because there can be incentives to pay more than a normal rate of compensation," which reduces profits and corresponding income tax. Keath analyzed compensation data available to valuation professionals, including a survey of licensed and non-licensed executives in the medical profession. He concluded that the appropriate range for Joubran's annual salary was $132,500 to $275,123, and "giving Mr. Joubran the benefit of the doubt," he selected $275,000 as a reasonable figure for Joubran's annual salary for the years 2003 through 2007. Joubran's actual average annual salary for those years was approximately $775,000. As a result, Keath concluded that Joubran's compensation was excessive.

Third, with respect to the credit card charges, Keath reviewed credit card statements and identified approximately $64,000 in charges by Joubran that appeared to be something other than legitimate business expenses and for which there was no evidence that Joubran had reimbursed CPS.

To calculate the fair value of Hughes's shares, Keath calculated "the fair value of the company in its entirety" under two scenarios, and "[took] 10% of those numbers." Under both scenarios, Keath added to CPS's profits the amount that he concluded was Joubran's excessive compensation for the relevant years. Under the first scenario, Keath assumed that the salaries paid to Joubran's children and the $64,000 in credit card charges were legitimate business expenses. Under that scenario, Keath concluded that the value of Hughes's ten percent of the CPS was $289,954. Under the second scenario, Keath assumed that the salaries paid to Joubran's children and the $64,000 in credit card charges were not legitimate business expenses. Under that scenario, Keath concluded that the value of Hughes's ten percent of the CPS was $296,311. Alternatively, Keath also testified that ten percent of CPS's book value plus the amount of Joubran's excessive compensation equaled approximately $290,000. We conclude that Keath's testimony was not conclusory, and was legally sufficient to support the jury's finding that the fair value of Hughes's shares was $300,000. *See, e.g., Averitt v. Caudle,* No. 11–07–00225–CV, 2009 WL 891034, at *4 (Tex.App.-Eastland Apr. 2, 2009, pet. denied) (mem. op.) (concluding expert's valuation testimony was not conclusory because he testified without objection about how he arrived at appraisal values using accepted appraisal methods).

**Third Complaint: Keath Relied on an Erroneous Assumption**

CPS and Joubran's third complaint in their fourth issue is that Keath incorrectly assumed that CPS is an S corporation, and "[t]hat error alone is worth over $ 2 million." CPS and Joubran were not required to raise this particular complaint below. *See Arkoma Basin Exploration*

*Co.*, 249 S.W.3d at 389 & n. 29 (explaining no objection to expert testimony is required when complaint on appeal is that opinion "assumed facts contrary to those on the face of the record"). The evidence that CPS and Joubran rely on, however, does not demonstrate that Keath's assumption about CPS was an error, or that the error was worth over $2 million.

To support their assertion that CPS is an S corporation, CPS and Joubran cite generally plaintiffs' exhibits 30 through 33—CPS's form 1120 federal income tax returns for the years 2005 through 2008—and the following testimony from Keath about those tax returns:

Q Mr. Keath, it's also my understanding—and you may have to help me because I didn't quite understand it. You assigned an additional factor between this adjustment for the type of corporation between an S and a C?

A Yes, that's right.

Q And your assumption is based on CPS being an S corporation?

A The income statements that I was given showed that they paid no taxes, which is characteristic of an S corporation.

Q Did you look at the tax returns?

A I did look at the tax returns.

Q It's true, is it not, the company's a C corporation?

A That's my understanding based on my reading of Mr. Tarpley's deposition transcript.

Q Well, I got the 2006 tax return, you can look at it, can't you.

A Yes.

Q What is it?

A It's a 2006 U.S. corporation income tax return.

Q What type of corporation?

A I don't see that it says. It's incorporated. It is a corporation.

Q Isn't it true that if this were an S corporation, on the very front of the tax return, it would say 1120 S?

A I have seen form 1120 S. First of all, I'm a CPA but I don't prepare tax returns. And I've seen form 1120 S, I've have [sic] also seen instances where forms were used that weren't what I expected to be used. Recognizing that this is—that it was possible that that could be going on here, and that it just wasn't an 1120 S. I did the calculation that shows both the C corporation value and the S corporation value. And because the financial statements that I was given, accrual based financial statements, statements that showed profits, had no tax provision in them, I assumed that it was an S corporation.

Q Well, don't you think that's a rather big hole in your analysis?

A I don't think it's a hole because I have the calculation of both the C corp and the S corp value.

This testimony indicates that there was conflicting evidence concerning whether CPS is an S or C corporation and that Keath calculated the value for both, not that he erroneously assumed it was an S corporation.

To support their assertion that there is an "over $ 2 million" error in Keath's valuation of CPS, CPS and Joubran cite generally to two schedules appended to Keath's expert report. Those schedules, however, do not demonstrate that Keath's valuation of CPS was erroneous. Instead they indicate that Keath calculated an "S–Corp Tax Benefit" of approximately $775,000 for CPS if CPS is an S corporation rather than a C corporation. CPS

and Joubran also cite generally to the following testimony from Keath:

Q Did you also take into consideration the differential between a subchapter S corporation and a subchapter C corporation?

A Yes, I did.

Q What did you do in that regard?

A A subchapter S corporation has a tax benefit that a subchapter C corporation doesn't. I apologize, it's kind of technical. But basically S corporations are allowed to avoid federal income taxes. You don't have to pay corporate taxes for earnings, profits that were earned through an S corporation. You do for a C corporation.

And that tax savings flows right through the shareholders and it makes those shares of an S corporation more valuable as a result. So part of our analysis, you know, it's a 51–page document and most of that is calculations and some of the calculations in there pertain to that difference, that tax savings and the value of the tax savings.

Q Okay. Did the numbers change if you consider a C or an S?

A Yes.

Q And did you calculate that for the jury?

A Yes, I did.

Q What did you come up with, sir?

A If you'll bear with me for a second, I'll flip back. Under the scenario A which is the lower scenario that would be $2,142.507. And under the higher scenario B, that figure would be $2,189,996.

This testimony, however, does not demonstrate that Keath's valuation of CPS was erroneous because of CPS's status as an S or C corporation.

Consequently, based on the evidence relied upon by CPS and Joubran, we cannot conclude that Keath's valuation opinion was erroneous or assumed facts contrary to the face of the record.

We resolve CPS and Joubran's fourth issue against them.

FIFTH ISSUE

■ In their fifth issue CPS and Joubran argue that Hughes was not entitled to prejudgment and postjudgment interest. More specifically, CPS and Joubran argue that "the buy-out is equitable relief, not a 'money judgment' on which interest may be awarded." In response, Hughes argues that CPS and Joubran failed to preserve this complaint for appellate review. We agree with Hughes.

■ In response to Hughes's motion for entry of judgment, they stated, "To the extent that Hughes actually prevails in a final judgment entered by this Court, then in that event CPS and Joubran would agree that Hughes is entitled to statutory pre and post judgment interest as well as costs of court." In order to preserve a complaint on appeal about the award of prejudgment and postjudgment interest, a party is required to first present the complaint to the trial court. *See Coleman v. Coleman*, No. 01–09–00615–CV, 2010 WL 5187612, at *3 (Tex.App.-Houston [1st Dist.] Dec. 23, 2010, no pet.) (mem. op.) ("A complaint regarding the award of postjudgment interest must be preserved in the trial court by a motion to amend or to correct the judgment or by a motion for new trial."); *Choy v. Graziano Roofing of Tex., Inc.*, 322 S.W.3d 276, 296–97 (Tex. App.-Houston [1st Dist.] 2009, no pet.) ("[B]y failing to object to the award of prejudgment interest at trial, the complaint has been waived."); *see also* TEX. R.APP. P. 33.1. In this case, CPS and Joubran did not complain below about the

award of prejudgment and postjudgment interest. As a result, we do not address their complaint about the award of prejudgment and postjudgment interest.

We resolve CPS and Joubran's fifth issue against them.

SIXTH ISSUE

In their sixth issue CPS and Joubran challenge the trial court's award of attorney's fees in favor of Hughes.

**Relevant Facts**

After the jury returned its verdict, Hughes filed a motion for entry of final judgment in which he sought attorney's fees (1) under section 37.009 of the Texas Civil Practice and Remedies Code for successfully defending against Joubran's claim for declaratory judgment, and (2) under article 2.44(D) of the Texas Business Corporation Act for successfully "asserting claims relating to the review of CPS's books and records." The trial court conducted a hearing on Hughes's request for attorney's fees. Hughes's counsel testified that Hughes incurred attorney's fees totaling $164,541.25 through the date of the hearing, and that all of the attorney's fees incurred by Hughes were "reasonable and necessary and customary in Dallas County." From the total fees incurred, Hughes's counsel excluded approximately $8,000 attributable to "changing an expert."

Hughes's counsel testified that Hughes incurred $7,175 in connection with his request to inspect CPS's books and records. He also testified that most of the remaining attorney's fees incurred were for work necessary to defend against Joubran's two claims for declaratory judgment. More specifically, Hughes's counsel testified that (1) Hughes had to prove shareholder oppression in order to defend against Joubran's request for a declaratory judgment that the Buy–Sell Agreement governed the buy-back of Hughes's shares, and (2) Hughes had to prove that he did not breach his fiduciary duties or tortiously interfere with the Methodist Hospital contract in order to defend against Joubran's request for a declaratory judgment that any damages that Hughes recovered should be offset by damages caused by Hughes.

Hughes's counsel testified that he calculated Hughes's recoverable attorney's fees under various scenarios. Under one scenario, he deducted (1) the fees attributable to changing expert witnesses, and (2) 15% of the fees relating to Hughes's claim against Joubran for breach of fiduciary duty, totaling approximately $8,000, due to the substantial overlap in the work required to prosecute that claim and to defend against Joubran's claims for declaratory judgment. Under that scenario, Hughes sought a total of $148,592 in attorney's fees through the date of the hearing. Hughes's counsel also testified that $75,000 and $25,000 would be the amounts of reasonable, necessary, and customary attorney's fees in the event of an appeal to the court of appeals and the supreme court, respectively. CPS and Joubran's counsel cross-examined Hughes's counsel but did not submit any controverting testimony or other evidence about Hughes's attorney's fees.

In its final judgment the trial court awarded Hughes $148,500 in attorney's fees for proceedings in the trial court, $75,000 in attorney's fees in the event that CPS and/or Joubran pursue an unsuccessful appeal to the court of appeals, and $25,000 in the event that CPS and/or Joubran pursue an unsuccessful appeal to the supreme court. And in its findings of fact and conclusions of law the trial court stated that "[a]ll of the attorney's fees awarded in the final judgment were reasonably incurred by Hughes in successfully defend-

ing the declaratory judgment action and/or obtaining access to CPS's books and records, they were properly segregated from attorney's fees that are not recoverable in this action, and none of those fees relate solely to a claim for which attorney's fees are unrecoverable."

CPS and Joubran filed a motion for new trial in which they generally argued that (1) the evidence was insufficient to support the attorney's fees award, (2) Hughes did not properly segregate "the attorney's fees between those causes of action in which attorney's fees are recoverable and those that are not," and the trial court improperly used the award of attorney's fees "to 'send a message' and 'make a statement' to Joubran and CPS." The motion for new trial was overruled by operation of law.

**Applicable Law and Standard of Review**

Under section 37.009 of the civil practice and remedies code, a trial court can award attorney's fees to the prevailing party in a declaratory judgment action, including a party who successfully defends against a declaratory judgment claim, if the trial court believes such fees to be reasonable and necessary and the award of such fees to be equitable and just. TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2008); *see also Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 317 (Tex.App.-Dallas 2009, pet. denied) (affirming award of attorney's fees to defendant who successfully defended against declaratory judgment claim).

 There are several factors a trial court should consider in determining the amount of reasonable attorney's fees to award. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West Supp.2011) (Tex. State Bar R. art. X, § 9); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997); *Jarvis*, 298 S.W.3d at 318. These factors

include: the time, labor, and skill required to properly perform the legal services; the novelty and difficulty of the questions involved; the customary fees charged in the local legal community for similar legal services; the amount involved and the results obtained; and the experience, reputation and ability of the lawyer performing the services. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b); *Arthur Andersen & Co.*, 945 S.W.2d at 818. But a trial court is not required to receive evidence on each of these factors. *Jarvis*, 298 S.W.3d at 318. The trial court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties. *Id.*

 When a trial court sits as the trier of fact, the amount of a fee award generally rests in the sound discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of discretion. *Id.* Sufficiency of the evidence to support the award is a relevant factor in assessing whether the trial court abused its discretion. *Id.*

**Analysis**

On appeal CPS and Joubran do not appear to challenge the award of conditional appellate attorney's fees. Instead, they raise four main complaints about the award of fees incurred through the date of the hearing on attorney's fees. We address each complaint separately.

First, CPS and Joubran argue that Hughes is not entitled to recover any attorney's fees for two related reasons: (1) "the essence of this dispute were conflicting tort claims, for which attorney's fees are not recoverable," and (2) Hughes's request for fees was negated because Hughes's tort claim "had 'greater ramifica-

tions than,' and 'subsumed' Joubran's limited request for a declaratory judgment." CPS and Joubran, however, did not raise these arguments in their motion for new trial, and they do not cite the record to demonstrate that they raised these arguments in the trial court either before or after the trial court rendered its final judgment. Consequently, we do not address these arguments on appeal. TEX.R.APP. P. 33.1; *see also Birnbaum v. Law Offices of G. David Westfall, P.C.*, 120 S.W.3d 470, 476 (Tex.App.-Dallas 2003, pet. denied) ("Without a proper presentation of the alleged error to the trial court, a party does not afford the trial court the opportunity to correct the error.").

 Second, CPS and Joubran cite *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex.2006), and argue that Hughes's attorney's fees were not properly segregated because he was obligated to segregate the "discrete legal services" pertaining to his defense of the declaratory judgment claim. We disagree. In *Tony Gullo Motors* the supreme court explained that when a party seeks to recover attorney's fees in a case in which fees must be segregated because only some claims allow for the recovery of attorney's fees, "many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other." 212 S.W.3d at 313. The court also explained that segregated attorney's fees do not "require more precise proof for attorney's fees than for any other claims or expenses," and attorneys do not need to keep separate time records. *Id.* at 314. Instead, it is sufficient for an attorney to opine that a certain percentage of the fees charged to the client would have been necessary even without the claim for which fees are not recoverable. *Id.* In this case, Hughes's attorney explained why the work done to defend against the declaratory judgment claims

overlapped with most of the work done to establish Hughes's claims for breach of fiduciary duty and to defend against CPS and Joubran's claims for breach of fiduciary duty and tortious interference with contract. Hughes's attorney also segregated the 15% of attorney's fees that related solely to Hughes's breach-of-fiduciary-duty claim for which fees were not recoverable. Although CPS and Joubran generally complained to the trial court that Hughes's fees were not sufficiently segregated, they did not submit any controverting testimony or other evidence to demonstrate that those fees were not adequately segregated or were capable of further segregation.

 Third, CPS and Joubran appear to argue that the evidence of Hughes's attorney's fees is insufficient because it was limited to the testimony of Hughes's attorney at the hearing on attorney's fees, and "[n]o fee statements or other documentation was offered or admitted in support of this testimony." We disagree. Documentary evidence is not a prerequisite to an award of attorney's fees. *See, e.g., Jarvis*, 298 S.W.3d at 319. Instead, testimony from a party's attorney is taken as true and is alone sufficient to support an award of attorney's fees if the testimony is clear, positive, direct, and free from contradiction. *Id.* This is especially true where the opposing party had the means and opportunity to disprove the testimony but failed to do so. *Id.* In this case Hughes's attorney's testimony was clear, positive, direct, and free from contradiction, and CPS and Joubran did not disprove his testimony.

Fourth, CPS and Joubran argue that the trial court improperly used the award of attorney's fees as a substitute for punitive damages. Their complaint arises from the following statement by the trial court at the conclusion of the hearing on Hughes's request for attorney's fees:

And I am going to assess attorney's fees in this case of six figures but probably low six figures, because of the overlap and inability to segregate all the attorney's fees because there's so much overlapping and work involved in it. But at the same time, I think they had to defend, what I think was, some wrong-spirited action on the part of your client.

This statement, however, does not demonstrate that the trial court used the award of attorney's fees as a substitute for punitive damages. And the award of $148,500 in attorney's fees to Hughes is supported by his counsel's testimony that he incurred $148,592 in attorney's fees attributable to defending against the two claims for declaratory judgment.

We conclude that the evidence supports the trial court's exercise of its discretion. We resolve CPS and Joubran's sixth issue against them.

### HUGHES'S CROSS-APPEAL

In a single issue on cross-appeal Hughes argues that the trial court erred when it refused to render judgment in favor of Hughes on his claim against Joubran for breach of fiduciary duty because Joubran owed fiduciary duties to Hughes as a matter of law.

### Background

Hughes's cross-appeal relates to the jury's answers to questions 7A through 10. In question 7A the jury was asked whether "a relationship of trust and confidence exist[ed] between Joubran and Hughes." The jury answered, "No." In question 7 the jury was asked whether Joubran complied with his fiduciary duty to Hughes. The jury was instructed to answer question 7 only if they answered "yes" to question 7A. Nevertheless, the jury answered, "No" to question 7. In question 8 the jury was asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Hughes for his damages, if any, that were proximately caused by such conduct?" The jury answered, "$ 247,000." In question 9 the jury was asked whether they unanimously found by clear and convincing evidence that the harm to Hughes resulted from malice. The jury answered, "Yes." In question 10 the jury was asked what sum of money should be awarded to Hughes as exemplary damages. The jury answered, "$1,600,000.00."

In his motion for entry of judgment, Hughes argued that he was entitled to judgment on his claim for breach of fiduciary duty, including an award of $247,000 in actual damages and $494,000 in exemplary damages (i.e., two times economic damages, pursuant to section 41.008(b) of the civil practice and remedies code), based on the jury's answers to questions 7 through 10. He also argued that the trial court should disregard the jury's answer to question 7A as "legally immaterial" because Joubran owed Hughes a fiduciary duty as a matter of law. Based on the jury's answer to question 7A, the trial court ordered that Hughes take nothing on his claim for breach of fiduciary duty.

### Analysis

On appeal Hughes argues that he was entitled to judgment on his breach of fiduciary duty claim because "a formal fiduciary relationship existed as a matter of law between Joubran and Hughes by virtue of Joubran's status as a majority shareholder dominating control over CPS." We disagree.

This Court and other intermediate Texas courts have rejected the argument that a shareholder in a closely held corporation owes a fiduciary duty to his co-shareholder as a matter of law. *See, e.g., Kaspar v. Thorne,* 755 S.W.2d 151, 155 (Tex.App.-Dallas 1988, no writ); *Schoellkopf v. Pledg-*

*er,* 739 S.W.2d 914, 920 (Tex.App.-Dallas 1987), *rev'd on other grounds,* 762 S.W.2d 145 (Tex.1988) (per curiam); *see also Allen v. Devon Energy Holdings, L.L.C.,* 367 S.W.3d 355, 391 (Tex.App.-Houston [1st Dist.] 2012, pet. filed); *Redmon v. Griffith,* 202 S.W.3d 225, 237 (Tex.App.-Tyler 2006, pet. denied); *Pabich v. Kellar,* 71 S.W.3d 500, 504 (Tex.App.-Fort Worth 2002, pet. denied), *Hoggett v. Brown,* 971 S.W.2d 472, 488 (Tex.App.-Houston [14th Dist.] 1997, writ denied).

Hughes cites *Willis v. Donnelly,* 199 S.W.3d 262 (Tex.2006) and argues that the Texas Supreme Court "has intimated that such a fiduciary duty exists." But in *Willis* the supreme court expressly declined to decide the legal question of "whether a majority shareholder in a closely held corporation owes a minority shareholder a general fiduciary duty under Texas law." *Id.* at 276. Hughes also cites three cases from other intermediate courts: *Cotten v. Weatherford Bancshares, Inc.,* 187 S.W.3d 687, 698–99 (Tex.App.-Fort Worth 2006, pet. denied); *Hoggett,* 971 S.W.2d at 488 n. 13; and *DeBord v. Circle Y of Yoakum, Inc.,* 951 S.W.2d 127, 133 (Tex.App.-Corpus Christi 1997), *rev'd on other grounds sub nom. Stary v. DeBord,* 967 S.W.2d 352 (Tex.1998) (per curiam). At most, however, those cases stand for the proposition that a majority shareholder who controls a closely held corporation may owe a fiduciary duty to a minority shareholder under certain circumstances, not that every majority shareholder who controls a closely held corporation owes a minority shareholder a fiduciary duty as a matter of law.

We conclude that the trial court did not err when it declined to render judgment in favor of Hughes on his claim for breach of fiduciary duty on the ground that Joubran owed Hughes a fiduciary duty as a matter of law.

We resolve Hughes's cross-appeal against him.

#### CONCLUSION

We resolve CPS and Joubran's issues on appeal against them, resolve Hughes's sole issue on cross-appeal against him, and affirm the trial court's judgment.