# NO. 12-12-00150-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TRACEY SELZER, ADMINISTRATOR OF THE ESTATE OF MICHAEL DEWAYNE VARNER, APPELLANT* | § | *APPEAL FROM THE 294TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *ROBBY DUNN, APPELLEE* | § | *VAN ZANDT COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Tracey Selzer, administrator of the estate of Michael Dewayne Varner, appeals from a summary judgment rendered in favor of Robby Dunn in this suit to determine the fate of the proceeds of a two million dollar life insurance policy. Selzer raises ten issues on appeal. We affirm.

### BACKGROUND

Dunn and Varner were each fifty percent shareholders in Cleanline Products, Incorporated, a company they started in 1997. In 2008, Lincoln Financial Life Insurance Company issued a two million dollar life insurance policy on Varner, naming Dunn as the sole beneficiary, and it issued a two million dollar life insurance policy on Dunn, naming Varner as the sole beneficiary. Cleanline paid the premiums on both policies. Varner died in 2010. Selzer, as administrator of Varner's estate, asserted a claim to the insurance policy proceeds. Lincoln concluded that the policy is payable as issued but withheld the funds pending resolution of the parties' conflicting claims.

Dunn filed a petition for declaratory judgment requesting the court declare him the sole beneficiary of the policy, entitled to 100% of the policy proceeds. He also requested attorney's fees and costs. Selzer filed counterclaims for breach of contract and breach of fiduciary duty,

requesting the court render judgment declaring either that Varner's estate is the exclusive beneficiary of the policy or, if Dunn is the exclusive beneficiary, that he holds the insurance proceeds in constructive trust for the estate. Selzer also filed a counterclaim for shareholder oppression, which was severed from the remainder of the case and is not part of this appeal.

The trial court granted Dunn's motion for summary judgment declaring that Dunn is the sole and exclusive beneficiary of the policy and entitled to all proceeds of the policy, but denied Dunn's request for attorney's fees. Further, the court ordered that Selzer take nothing on her counterclaims and pay Dunn's court costs.

## SUMMARY JUDGMENT

In her first, fifth, sixth, and ninth issues, Selzer contends that the trial court erred in granting summary judgment in favor of Dunn. She questions whether a declaratory judgment action is a proper remedy in this case. She asserts that the insurance policy naming Dunn as the beneficiary was procured through improper means and therefore summary judgment based on the terms of the policy is inappropriate. Additionally, she argues that there are issues of fact regarding the existence of an oral agreement and whether Dunn violated his fiduciary duty by breaching that agreement.

### Standard of Review

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX. R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged element. *See Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 317 (Tex. App.–Houston [1st Dist.] 1999, no pet.). A no evidence summary judgment is essentially a pretrial directed verdict. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact concerning one or more essential elements of the plaintiff's claims and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). Once the movant has established a right to

summary judgment, the nonmovant has the burden to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See* ***City of Houston v. Clear Creek Basin Auth.***, 589 S.W.2d 671, 678-79 (Tex. 1979). Review of a summary judgment under either a traditional standard or no evidence standard requires that the evidence presented by both the motion and the response be viewed in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding all contrary evidence and inferences unless reasonable jurors could not. ***Gish***, 286 S.W.3d at 310; ***Walmart Stores, Inc. v. Rodriquez***, 92 S.W.3d 502, 506 (Tex. 2002); ***Nixon***, 690 S.W.2d at 548-49. Evidence that favors the movant's position will not be considered unless it is uncontroverted. ***Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.***, 391 S.W.2d 41, 47 (Tex. 1965).

When a party moves for both a no evidence and a traditional summary judgment, we first review the trial court's summary judgment under the no evidence standard of Rule 166a(i). ***Merriman v. XTO Energy, Inc.***, 407 S.W.3d 244, 248 (Tex. 2013). If the no evidence summary judgment was properly granted, we do not reach arguments under the traditional motion for summary judgment. *See* *id*.

## Declaratory Judgment

Dunn moved for summary judgment on his declaratory judgment action, seeking a declaration that he is the sole beneficiary entitled to all of the insurance proceeds. In support, Dunn included the reciprocal insurance policies, as well as the applications submitted to Lincoln National Life Insurance Company.

A person interested under a written contract may have determined any question of construction or validity arising under the instrument and obtain a declaration of rights thereunder. TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (West 2008). We interpret insurance policies according to the rules of contract construction. ***Am. Mfrs. Mut. Ins. Co. v. Schaefer***, 124 S.W.3d 154, 157 (Tex. 2003). If policy language is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and we construe it as a matter of law. *Id*.

Here, Dunn is named as the owner of the policy insuring Varner's life. The policy specifies that it, along with the application and any endorsements or amendments and riders, make up the contract. The policy further provides that the designation of beneficiary in the application shall remain in effect until the policy owner changes it. In the application, Varner

named Dunn sole beneficiary. This evidence shows that Dunn is entitled to judgment as a matter of law on his declaratory judgment action and he is the sole beneficiary of the insurance policy. *See Nixon*, 690 S.W.2d at 548. We overrule Selzer's ninth issue.

**Breach of Contract**

Dunn's motion for summary judgment also addressed Selzer's counterclaim for breach of an alleged oral contract. Under the terms of that contract, Selzer argues, the estate is entitled to all of the insurance policy proceeds, in exchange for Varner's stock in the company. Dunn asserted that there is no evidence of the elements of a breach of contract cause of action. Specifically, he contended there is no evidence of an offer, an acceptance, a meeting of the minds, execution, or delivery. He argues that the terms of the buyout were never agreed upon, especially the price to be paid for the shares. The summary judgment evidence Dunn relies on for this assertion includes excerpts from his own deposition testimony, and that of Julie Stern, counsel for Cleanline, and Adam Piper, Cleanline's financial advisor.

Dunn testified that he and Varner agreed to purchase life insurance and they agreed that each would be the owner and beneficiary of a policy on the other's life. He explained that, in case one of them died, neither wanted to deal with the family of the deceased so they intended the surviving partner to buy out the family of the deceased. Dunn testified that they talked about what to do with the life insurance proceeds if one of them died, but they never came to any agreement about purchasing stock. They discussed "trying to do a buy-sell agreement," but Dunn "never could get [Varner] to agree to anything." Therefore, although they discussed many options, they never agreed to the number of shares to be purchased or the price to be paid. Neither of them committed to any of the terms of a buyout. Originally, when they bought the two insurance policies, the intent was to protect each other. Other people brought up the idea of a cross-purchase agreement. They never told their attorney any terms to include in a buy/sell agreement, but she produced some drafts as examples for them to consider.

Julie Stern, counsel for Cleanline, testified that, in a meeting with Piper, Dunn, and Varner, she was told they had "bought life insurance so that they can buy out each other's share and have cash and whatnot when — if either of them dies." They discussed the fact that they needed a buy/sell agreement, but they did not discuss the terms of such an agreement. They asked for examples of cross-purchase agreements. She did not know what they wanted so she sent them three different options for their consideration. She told her assistant to "go into

4

ProDoc, plug in my client's name, and print out three different versions of a cross-purchase or buy-sell agreement." Her purpose was to give them an idea of what a cross-purchase agreement would look like. Had Dunn and Varner liked any of those choices, they would have been ready to move forward. She testified that there was an understanding that the insurance would be used to purchase the shares of the decedent's family and have money left over, but there was no agreement as to how that would be done. Dunn and Varner never gave her final instructions as to an agreement regarding the value of the company or the value of the shares. Additionally, Stern explained that there was a typographical error in the September 18 letter that accompanied one of the drafts. It was addressed to Varner and Mrs. Dunn, but it should not have been addressed to Mrs. Dunn. It was meant for Varner and Robby Dunn. Later, Varner made it clear to her that he wanted to be able buy out Dunn's share of the business if Dunn died and have some money left over to do what is needed after the loss of a business partner.

Stern explained the purpose of the insurance policy. If one of the partners passed away, the policy proceeds would give the other person the means to purchase the company from the surviving spouse and family and compensate for the loss of the business partner, that is, have money left over for the surviving business partner. Stern testified that there was never any discussion that all of the insurance money was to be used to purchase the shares of the decedent. She explained that neither Dunn nor Varner believed that the business was worth four million dollars and they intended to have cash left after purchasing the deceased partner's share of the business. Stern testified that they each intended to keep the cash for themselves rather than give it to the family of the first to die. She reiterated that neither Dunn nor Varner ever gave her any specifics as to the terms for the value of the company or of the shares and they never selected one of the draft agreements.

Adam Piper, a financial advisor who aided Dunn and Varner in obtaining their life insurance policies, testified that they indicated to him that there would be a buy/sell agreement. They did not mention the terms of the agreement, and they never communicated to him a stated dollar amount of the life insurance proceeds that would be used toward the buy/sell agreement. Dunn told him "an amount" was never agreed upon. Piper stated that the purpose of the insurance policies was to provide the surviving partner with the means to purchase the company from the deceased partner's family and to compensate for the potential loss of income due to the loss of the business partner. He never heard any discussion that all of the insurance proceeds

would go directly to the estate to purchase the company. He understood that some portion of the proceeds would be used to purchase the decedent's share in the company. To his knowledge, there was never any agreement as to the terms of a proposed buy/sell agreement. He never heard them discuss a price for the value of the company. He also never heard either of them express an interest in having money left over after buying out the company. Piper understood that Dunn and Varner were never able to agree upon a specific dollar amount for the purchase of the company.

The essential elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) damages sustained by the plaintiff as a result of the breach. *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App.–Houston [1st Dist.] 2001, no pet.). The requirements of a valid contract include acceptance of the terms of the offer and a meeting of the minds. *Hubbard v. Shankle*, 138 S.W.3d 474, 481 (Tex. App.–Fort Worth 2004, pet. denied). The term "meeting of the minds" refers to the parties' mutual understanding and assent to the expression of their agreement. *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.–Dallas 1999, pet. denied). The parties must agree to the same thing, in the same sense, at the same time. *Id*. The determination of whether there is a meeting of the minds is based on an objective standard of what the parties said and did and not on their subjective state of mind. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.–San Antonio 1999, pet. denied). With respect to an oral agreement to transfer stock, the terms must state the specific quantity of shares and the specific price in order to be considered clear, certain, and definite. *Gannon v. Baker*, 830 S.W.2d 706, 709 (Tex. App.–Houston [1st Dist.] 1992, writ denied) (op. on remand).

Here, Dunn's summary judgment evidence shows that he and Varner never agreed to the number of shares the surviving partner would purchase or the price he would pay for those shares. Further, there was no agreement that any portion of the proceeds would be given to the family of the deceased beyond what was required to purchase the deceased's shares. Thus, there was no meeting of the minds on these terms that were necessary to the creation of a valid buy/sell agreement. *See id*. Accordingly, there was no valid oral contract. *See Hubbard*, 138 S.W.3d at 481. Thus, Dunn's summary judgment evidence shows there is no evidence of a breach of contract, and Dunn is entitled to summary judgment on Varner's counterclaim for breach of contract. *See* TEX. R. CIV. P. 166a(i).

6

*Selzer's Response*

Selzer asserts that an oral contract exists and that a buy/sell agreement of some sort was a part of their agreement. Further, she argues, Dunn breached the contract when he refused to pay the life insurance proceeds to the estate. She points to the three drafts that had been prepared by Stern, relying heavily on the draft that was last modified. Additionally, she presented the affidavit of Gary Varner, her own testimony, and that of Tascha Snow, Denise Owens, and Dr. John Turner.

In his affidavit, Varner's brother, Gary Varner, explained that when Varner died, Dunn initially denied that Varner had any life insurance. Days later, Dunn admitted that there is a life insurance policy and that Dunn is the named beneficiary. Dunn told Gary that he was willing to pay the estate the reasonable value of Varner's one-half interest in Cleanline but stated that he should retain the remainder because he and Varner had wanted a "big payout" if one of them died.

In her deposition testimony, Denise Owens explained that she was a high school friend of Varner's. In late summer or early fall of 2008, he called her and told her he and Dunn met with an insurance agent and were obtaining life insurance and the "insurance was to be divided up amongst the four children for a quarter of a million dollars apiece." Although he stated his wishes about what his children should receive upon his death, he did not say how they were to get that money.

In her deposition testimony, Selzer, Varner's ex-wife, explained that, in 2008, Varner told her he had a two million dollar insurance policy. One million was to go to Dunn to buy the family out of the company and the other million was to be divided up among his four children.

Tascha Snow, who had dated Varner, testified that he told her that he had a life insurance policy at "the company." He told her "that policy would be used to go to his estate to pay them off for his portion of the company and that his family — that his kids would be taken care of and the company would be protected." Varner indicated that arrangement was a "done deal." She understood that Dunn would have the company and the estate would have the insurance money. However, Varner never discussed amounts, and she assumed that all of the proceeds would go to the estate. Varner never told her that all of the life insurance proceeds would go to the estate. Varner told her "the money from the policy would go to the estate."

Julie Stern explained that three versions of a cross-purchase agreement were created in a span of less than half an hour on September 4, 2008. She had asked her assistant to print out three different versions. Stern did not recall asking her assistant to make any changes in the documents. Exhibit 3A was the last to be modified and was modified on September 16, 2008. But she never heard from Dunn or Varner about the cross-purchase agreement. Exhibit 3A provided that the surviving shareholder shall be obligated to purchase all of the deceased shareholder's shares. The draft required the purchase price of each share of stock to be the book value, to be determined by dividing the company's net worth by the number of shares outstanding, as determined by an independent certified public accountant. Finally, regarding the purchase and sale of stock owned by a deceased shareholder, the draft required that "a full payment toward the purchase price for all of the deceased Shareholder's stock shall be paid upon the consummation of such sale in an amount equal to the life insurance proceeds that are received by the other Shareholder" pursuant to a life insurance policy on the life of the deceased shareholder. The draft was not signed or dated.

Dr. John Turner, Varner's personal physician, testified that Varner had a number of health problems. Varner told Turner that he had insurance and his children would be taken care of. Varner did not tell him the amount of the policy or who was the named beneficiary.

Selzer's evidence shows, at best, that Varner had a subjective belief that the proceeds of the insurance policy would be given to his four children. His subjective state of mind is not sufficient to show a valid contract. *See **Copeland***, 3 S.W.3d at 604. The unsigned draft of a buy/sell agreement is not evidence of a specific agreement between Varner and Dunn. This evidence does not show that Dunn and Varner had a meeting of the minds regarding the price to be paid for the deceased shareholder's shares or how many shares the survivor would purchase. *See **Gannon***, 830 S.W.2d at 709. Further, this evidence does not support a finding that Dunn and Varner had an agreement that a portion of the insurance proceeds would be given to Varner's children. *See **Weynand***, 990 S.W.2d at 846. Accordingly, Selzer did not raise a fact question on any of the elements of her breach of contract cause of action. *See **Macias***, 988 S.W.2d at 317. Thus, the trial court did not err in granting Dunn's motion for summary judgment on Selzer's counterclaim for breach of contract. *See* TEX. R. CIV. P. 166a(i). We overrule Selzer's first issue.

8

**Breach of Fiduciary Duty**

Dunn also sought summary judgment on Selzer's breach of fiduciary duty counterclaim. Selzer asserted that Dunn breached his fiduciary duty by structuring the life insurance policies as he did, inducing Varner to enter into the life insurance agreement, and refusing to carry out the oral agreement Varner and Dunn allegedly made. Selzer argued that a constructive trust should be imposed on the proceeds of the insurance policy and Dunn should forfeit all or a part of the consideration he is to receive.

We agree with Dunn that the economic loss rule bars Selzer's breach of fiduciary duty claim. If the defendant's conduct would give rise to liability only because it breaches the parties' agreement, the plaintiff's action is ordinarily on the contract. *Sw. Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 494 (Tex. 1991). When the only loss or damage is the subject matter of the contract, the plaintiff's action is ordinarily on the contract. *Id*.

Selzer's claims for breach of contract and breach of fiduciary duty are based on the same alleged oral contract. As discussed above, there is no evidence of a valid oral contract. The duties allegedly breached were based on, or in conjunction with, the alleged oral contract and the damages Selzer claimed stemmed from that contract. *See id*. at 495. Accordingly, Selzer's claim was solely in contract. Dunn showed entitlement to summary judgment on Selzer's breach of fiduciary duty claim as a matter of law. *See* TEX. R. CIV. P. 166a(c). We overrule Selzer's fifth and sixth issues.

## POSTJUDGMENT INTEREST

In her tenth issue, Selzer contends that the trial court erroneously awarded Dunn postjudgment interest. She argues that the court's declaratory judgment is not a "money judgment" as anticipated by the statute requiring the interest rate to be included in the judgment. We agree with Dunn's assertion that Selzer has waived this complaint.

A complaint regarding the award of postjudgment interest must be preserved in the trial court by a motion to amend or to correct the judgment or by a motion for new trial. *Cardiac Perfusion Servs. v. Hughes*, 380 S.W.3d 198, 209 (Tex. App.–Dallas 2012, pet. filed). Selzer has not identified where in the appellate record it is documented that she raised this issue in the trial court, and we have been unable to locate any such motion. Accordingly, we overrule Selzer's tenth issue.

9

## DISPOSITION

The trial court correctly granted Dunn's motion for summary judgment, declaring Dunn the appropriate recipient of the life insurance proceeds at issue and rendering judgment that Selzer take nothing on her counterclaims for breach of contract and breach of fiduciary duty. We need not reach Selzer's issues two through four, seven, or eleven.[1]  *See* TEX. R. APP. P. 47.1.

We *affirm* the trial court's judgment.


**SAM GRIFFITH**
Justice


Opinion delivered January 31, 2014.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*


(PUBLISH)

---

[1] There is no eighth issue.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 31, 2014**

**NO. 12-12-00150-CV**

**TRACEY SELZER, ADMINISTRATOR OF THE ESTATE OF MICHAEL DEWAYNE VARNER,**
Appellant
V.
**ROBBY DUNN,**
Appellee

Appeal from the 294th District Court

of Van Zandt County, Texas (Tr.Ct.No. 10-00675)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellant, **TRACEY SELZER, ADMINISTRATOR OF THE ESTATE OF MICHAEL DEWAYNE VARNER**, for which execution may issue, and that this decision be certified to the court below for observance.

Sam Griffith, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*